852 F.2d 569
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terry Shawn BONNER (87-3648), Charles Alva Parker, Jr.
(87-3649), Defendants- Appellants.
 Nos. 87-3648, 87-3649.
 United States Court of Appeals, Sixth Circuit.
 July 13, 1988.
 
 Before KEITH, BOYCE F. MARTIN, Jr. and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Terry Shawn Bonner was convicted in district court on a variety of counts involving the distribution of cocaine and the use of extortionate means to collect a debt. Defendant Charles A. Parker was convicted on two of these counts. On appeal both defendants argue that two pieces of evidence admitted against them were unduly prejudicial and ought to have been excluded. Each defendant makes additional arguments in which the other does not join. Finding that none of these arguments has merit, we shall affirm the convictions.
 
 I.
 
 2
 In September of 1986 one Kenneth Oldford was introduced to defendant Parker by a mutual friend. Messrs. Oldford and Parker started using cocaine together, and Oldford soon began to purchase cocaine from Parker on credit. By November of 1986 Oldford owed Parker $1800; by the following January the tab had risen to over $5000.
 
 
 3
 In the latter part of January Oldford repeatedly encountered defendant Bonner at Parker's house. On one such occasion Bonner brought up Oldford's debt, showed him a sawed-off shotgun, and told him that the gun was used for "enforcement on people that didn't pay their debts." Parker later told Oldford that Bonner had made plans to shoot Oldford in the leg for not paying the debt, but had decided not to do so.
 
 
 4
 Bonner made numerous phone calls to Oldford about the debt. In one such call he described himself as an "enforcer" and threatened to tell Oldford's wife about the cocaine use and debt. The phone calls continued into February, but Oldford was not home to receive many of them, having checked into a local hospital on Monday, February 9, 1987, to participate in a drug rehabilitation program. Bonner left messages on Oldford's answering machine.
 
 
 5
 Oldford took a day's leave from the rehabilitation program on the following Sunday and returned to his home. He listened to Bonner's messages--one telling him to pay his debt before something happened to his house--and then took another such call that Bonner happened to make while Oldford was there.
 
 
 6
 Oldford returned to the hospital the next day. Two days later, while at the hospital, he phoned Parker about the debt. Parker turned the call over to Bonner. Upon hearing that Oldford intended to pay, Bonner said that he was glad to hear it and that he would "try to stop them," but it could be "too late." By the time of this call, Oldford learned later, his house had been set on fire.
 
 
 7
 Oldford went to the local police. On the following Saturday, under police supervision, he began taping conversations with Bonner and Parker. On Sunday, February 22, he arranged by telephone to meet Bonner and pay him $1000. The conversation, which was taped, went as follows:
 
 
 8
 "Kenny [Oldford]: Hello?
 
 
 9
 Shawn [Bonner]: Kenny?
 
 
 10
 Kenny: Say.
 
 
 11
 Shawn: How long it take you to get to that Friendly's you were talking about?
 
 
 12
 Kenny: Oh, about, oh, just a minute or two.
 
 
 13
 Shawn: OK, its 5:15 by my time. I'm there.
 
 
 14
 Kenny: OK. And they'll prob ... Say, listen, uh, I was kinda nervous and shit but I was wonderin' one thing there. You wouldn't happen to have anything to tide me over a little bit, would ya?
 
 
 15
 Shawn: Valiums, maybe.
 
 
 16
 Kenny: Valiums? Ouch. I ain't never tried any of them. They kinda calm me down a little bit?
 
 
 17
 Shawn: Exactly what they're for.
 
 
 18
 Kenny: What do you want for 'em?
 
 
 19
 Shawn: Nothin.
 
 
 20
 Kenny: Nothin?
 
 
 21
 Shawn: I don't sell drugs. You'll figure that out some day.
 
 
 22
 Kenny: Oh, OK. Well, I'll be along, oh, just as soon as it takes me to get things, ... to get my car and get on down there.
 
 
 23
 Shawn: Well, 10 minutes, I'll be gone.
 
 
 24
 Kenny: OK. I'll be there."
 
 
 25
 The meeting took place as arranged, and Oldford gave Bonner $1000 in cash. Bonner gave Oldford an envelope that contained two pills and a handwritten receipt, dated February 22, 1987, showing a reduction of "personal debt" from $5250 to $4257.
 
 
 26
 During a conversation held in the late afternoon of February 26, 1987, Bonner referred, as he would do a number of times over the next few days, to the fate of a man from the nearby city of Upper Arlington Heights, Ohio:
 
 
 27
 "Shawn [Bonner]: I hope you know that they'll go to no end to get even, if not to get what's owed 'em.
 
 
 28
 Kenny [Oldford]: Um humm.
 
 
 29
 Shawn: You understand that?
 
 
 30
 Kenny: Well, you know, what if I can't get the money, what's gonna happen?
 
 
 31
 Shawn: It won't be in my hands.
 
 
 32
 Kenny: Um humm. Well, give me a time I can call you in the morning.
 
 
 33
 Shawn: They will probably show you something of a more extreme nature, ah, that they mean business. And, ah, it won't be in my hands. I'll just tell you that right now.
 
 
 34
 Kenny: Well, what else can they do? You know, my family is separated from me, my wife has left me, my house is burnt.
 
 
 35
 Shawn: You don't know? You really don't know? Please don't do this to me.
 
 
 36
 Kenny: Well, I, you know, I really don't know.
 
 
 37
 Shawn: Okay, well, use your imagination. Cause I'm tellin you right now, I'm sure you've heard even in Upper Arlington what happened to one guy just recently. There's $10,000 bond, reward offered for information on that one. Of course, the person who turns it over may as well go down and buy his plot. But, then, nevertheless,.....
 
 
 38
 Kenny: Um humm.
 
 
 39
 Shawn: ...., ah, you know, that thing about anonymity isn't real.
 
 
 40
 Kenny: Uh huh. Okay well, listen, give me a time when I can call you in the mornin' so we can get together.
 
 
 41
 Shawn: I have a pager number you can call me 24 hours a day, sir.
 
 
 42
 Kenny: Okay."
 
 
 43
 During another conversation Bonner claimed involvement in setting fire to Oldford's house:
 
 
 44
 "Shawn: I mean, uh, the whole idea was that you could make some money on this. That's why it was done. But I can't tell you that they're gonna or they're not gonna______, I'll say .. 'I don't know what the fuck happened'.
 
 
 45
 Kenny: Yeah.
 
 
 46
 Shawn: Okay. You know we know what happened?
 
 
 47
 Kenny: Um humm.
 
 
 48
 Shawn: But, ah, they wanna to get across to you that they meant business. I mean, that same thing coulda happened while you was in the house. And that guy who stays with you, Chris, whatever his name is, and your family. I mean, it woulda been done a little bit differently. Ah, you have a gas stove in your home, and, ah, you know, they coulda gotten in there and turned all the knobs, shut off-turn your gas heater off--and all the fires woulda gone out, okay, turn your gas back on, allright? You know what I'm sayin?
 
 
 49
 Kenny: Um humm.
 
 
 50
 Shawn: Filled the house full of gas and it would all went up with you guys in it. There's a whole bunch of ways you can do things. Yeah, you know. There's a bunch of other ways you can do people. but, I don't see it happening. I don't see it wanting to happen to you. I'm tellin you this man-to-man, because I've never knew you before. I don't want that to happen to you, not because I like you because now I mean, because I know you a little bit.
 
 
 51
 Kenny: Yeah.
 
 
 52
 Shawn: But, ah, you're a young man______you can get your life back together. Fine, do it. but [sic] don't fuck up over this bullshit. I know, its [sic] big money but what the fuck. You a thousand down now. And, uh, you know, before that it was 5,250 and now you put 1,500 toward that so that'll come right off the top of it.
 
 
 53
 Kenny: Yeah."
 
 
 54
 The police arrested Bonner on February 24. On February 27 they arrested Parker. Parker made incriminating statements at the time of his arrest and consented to a search of his home; the search revealed incriminating evidence.
 
 II.
 
 55
 A federal grand jury indicted Bonner and Parker, charging that each had conspired to distribute cocaine, a violation of 21 U.S.C. Sec. 846; that each had conspired to collect a debt through extortionate means, a violation of 18 U.S.C. Sec. 894; that Bonner had used extortionate means to collect a debt, another violation of Sec. 894; and that Bonner had twice used a communication facility to facilitate the conspiracy to distribute cocaine, each use being a violation of 21 U.S.C. Sec. 843(b). In a trial before a jury the government relied heavily on Oldford's testimony and on tape recordings of his conversations with Bonner.
 
 
 56
 In connection with Oldford's testimony about his delivery of the $1000 to Bonner, the government introduced into evidence the receipt and the two "Valium" pills that Bonner had handed over. In connection with Oldford's testimony on the February 26th conversation and the fate of the man in Upper Arlington, the government introduced, over objection, an article from that day's edition of a local newspaper.
 
 
 57
 "[Assistant United States Attorney]
 
 
 58
 Q. Do you remember specifically on February 26, 1987, of calling Charles Parker?
 
 
 59
 [Mr. Oldford]
 
 
 60
 A. Yes, I do.
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 Q. Sir, there was a reference to you know what happened to a man up in Upper Arlington, a reference that it was in the paper. Have you seen that article in the paper?
 
 
 64
 A. Yes, I did.
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 Q. I will hand you what has been marked for identification purposes as Government's Exhibit No. 19. Do you recognize that exhibit?
 
 
 68
 A. Yes, I do.
 
 
 69
 * * *
 
 
 70
 * * *
 
 
 71
 Q. And Government's Exhibit No. 19 which you have in your hand, without indicating specifically what it is, is it an article from a paper?
 
 
 72
 A. Yes, it is.
 
 
 73
 Q. Is that the Columbus Dispatch?
 
 
 74
 A. Yes, it is.
 
 
 75
 Q. What is the date on that Columbus Dispatch?
 
 
 76
 A. Thursday, February 26, 1987.
 
 
 77
 Q. Now, when does the Columbus Dispatch come out?
 
 
 78
 A. In the morning.
 
 
 79
 * * *
 
 
 80
 * * *
 
 
 81
 Q. Did--after having this conversation with Shawn Bonner, did you have an occasion to look at Government's Exhibit 19?
 
 
 82
 A. Yes, I did.
 
 
 83
 Q. What specifically is it?
 
 
 84
 MR. KELLER [a defense counsel]: Objection, Your Honor. May we approach the bench?
 
 
 85
 THE COURT: Yes.
 
 
 86
 (Bench conference out of the hearing of the jury.)
 
 
 87
 * * *
 
 
 88
 * * *
 
 
 89
 MR. KELLER: Just for the record, I again raise our objection that we raised before about the prejudicial effect of this piece of evidence.
 
 
 90
 THE COURT: The jury has been instructed on that.
 
 
 91
 (End of bench conference.)
 
 
 92
 THE COURT: Ladies and gentlemen of the jury, this particular--at this particular point, it appears that we are about to receive some evidence that relates to one of the matters the Court gave you an instruction on at the very beginning of the trial. I simply want to remind you of that instruction. We are going to hear evidence about a shooting death that occurred in Upper Arlington and you may hear some testimony about a newspaper article concerning the matter. This evidence is not being introduced in this trial for the purpose of showing that any of these defendants had anything whatsoever to do with that event. This evidence is being introduced for a limited purpose, namely to explain what the witness may have interpreted the comment as having referred to. You are not to speculate in any way about who may have been involved in this event in Upper Arlington, and you should accept the Court's instruction that you should take it as an established fact that none of these defendants had anything to do with that. The issue here is whether or not that event is somehow used by them in the matters that are the subject of the charges here in this courtroom.
 
 
 93
 You may proceed.
 
 
 94
 BY MR. SHROYER [Assistant United States Attorney]:
 
 
 95
 Q. Have you had an occasion--if I could ask the clerk to hand the witness Government's Exhibit No. 19. Did you have an occasion to review that article?
 
 
 96
 A. Yes, I have.
 
 
 97
 * * *
 
 
 98
 * * *
 
 
 99
 Q. What does the article explain concerning the events that occurred in Upper Arlington?
 
 
 100
 A. It explains that there is a $10,000 reward out for information leading to a man's death. It appears to be a murder-for-hire type deal.
 
 
 101
 Q. It speculates that the person was killed by who?
 
 
 102
 A. Someone that he knew.
 
 
 103
 Q. And someone that was what?
 
 
 104
 A. Hired to do it.
 
 
 105
 Q. Is there any indication in the article that the victim had any sort of--was connected with any sort of illicit activity?
 
 
 106
 A. It does say that there was a small amount of marijuana found.
 
 
 107
 Q. In your telephone conversation that we just heard, what specifically was it that Shawn Bonner said about an incident in Upper Arlington?
 
 
 108
 Q. That I know you recently heard about a man over in Arlington, there was a $10,000 reward out for him, and that anybody that turns that information over might as well go down and buy their plot.
 
 
 109
 Q. Did you have any more phone calls with Shawn Bonner on the 26th, that day?
 
 
 110
 A. I don't believe so."
 
 
 111
 On cross-examination by Bonner's attorney, Mr. Oldford had this to say about the article:
 
 
 112
 "[Bonner's attorney]
 
 
 113
 Q. Mr. Oldford, with regard to this newspaper article that you testified about, did you actually read that article?
 
 
 114
 A. Yes, I did."
 
 
 115
 At the close of the evidence, the court heard arguments on the admissability of the article. The defendants argued that the article was cumulative evidence as to Oldford's receipt of a threat, and they maintained that it was unduly prejudicial both because the jury already had the contents of the article before it in the form of Mr. Oldford's testimony and because the actual article would cause the jury to speculate as to what really happened in Upper Arlington. The district court observed that none of the facts or circumstances relayed in the article bore "any direct relationship to any of the evidence in this case ...," a circumstance that mitigated the danger of prejudice. The court took it that Bonner's references to the fate of the man in Upper Arlington and to the $10,000 reward were references to the article. Concluding that there was not "any significant likelihood" that the jury would disregard the court's limiting instructions, the court allowed the article to be received in evidence.
 
 
 116
 Oldford's testimony also covered the fire at his house and Bonner's repeated references to it. Again the district court gave a limiting instruction:
 
 
 117
 "THE COURT: Ladies and gentlemen, ... the Court feels that it would be appropriate to remind you of the instruction that I gave you at the outset of this case. I would like to read parts of that instruction again. You will remember that I told you that you would hear certain references to a fire which occurred at Mr. Oldford's home. The cause of that fire was and is undetermined. None of these defendants are charged with causing that fire, and you should not concern yourselves with or speculate about the cause of that fire.
 
 
 118
 Now, the evidence concerning the fire, in particular this last item of evidence, is being admitted by the Court for a limited purpose and is to be taken by you and used by you only for a limited purpose. It is not being offered to show that any of these defendants had anything to do with causing that fire. It is being introduced to show, or it is being introduced by the Government in an attempt to show, if you will, that these defendants, or one of them in particular, may have used the occurrence of that fire in the course of the alleged attempt to intimidate or to extort. Now, that is the only purpose for which this evidence is being introduced. It is not being introduced for the cause of proving or disproving who caused the fire and that is not the concern with you. These defendants are not charged with that, period.
 
 
 119
 You may take it as an established fact that they had nothing to do with causing that fire. The only issue here is whether or not they used that event for the purpose of a threat to express or imply as to some future harm that might occur."
 
 
 120
 The jury returned guilty verdicts to the extent indicated above. The district court sentenced Bonner to two consecutive ten-year terms of imprisonment for the two conspiracies, to a concurrent five-year term of imprisonment for the use of extortionate means, and to two concurrent two-year terms of imprisonment for the illegal use of wire facilities. Parker was sentenced to a ten-year term of imprisonment for the conspiracy to distribute cocaine, that sentence to run consecutively with a state sentence that Parker was then serving, and to a five-year term of parole for the conspiracy to extort, that sentence to run consecutively with the ten-year term of imprisonment. Both defendants appeal.
 
 III.
 
 121
 The defendants ask us to overturn their convictions because of the admission of the newspaper article and the tape recordings of conversations between Bonner and Oldford concerning the fire. Defendants argue that this evidence was not relevant and was unduly prejudicial.
 
 
 122
 One of the crimes with which these defendants were charged was a conspiracy to violate 18 U.S.C. Sec. 894; that statute says that a person who "knowingly participates in any way, or conspires to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit ..." has committed a crime. "An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. Sec. 891(7). Whether particular means are "extortionate" depends on whether they are reasonably likely to induce fear in an ordinary person. United States v. Joseph, 781 F.2d 549, 553 (6th Cir.1980) (quoting United States v. Natale, 526 F.2d 1160, 1168 (2d Cir.1975), cert. denied, 425 U.S. 950 (1976)).
 
 Rule 401, Fed.R.Evid., provides:
 
 123
 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
 
 
 124
 Rule 402 provides: "All relevant evidence is admissible, except as otherwise provided ... by these rules...." Rule 403 says: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." The Advisory Committee Notes proposing Rule 403 indicate that: "unfair prejudice," in context, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."
 
 
 125
 This court has recognized that a district court's decision with regard to Rule 403 is committed to the district court's sound discretion:
 
 
 126
 "Appellate court review of this discretion is limited. We must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.... 'If judicial self restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal.' "
 
 
 127
 United States v. Zipkin, 729 F.2d 384, 389-90 (6th Cir.1984) (quoting United States v. Long, 574 F.2d 761, 767 (3d Cir.), cert. denied, 439 U.S. 985 (1978)) (other citations omitted). This admonition is particularly appropriate where, as here, the district court gave a limiting instruction under Rule 105, Fed.R.Evid. Such limiting instructions, as the Advisory Committee Notes to Rule 105 tell us, bear a "close relationship" to the balancing required under Rule 403. Cf. United States v. Hans, 684 F.2d 343, 346 (6th Cir.1982) (holding district court abused its discretion in not admitting evidence when danger of unfair prejudice could have been mitigated by jury instructions). Lastly, we recognize that any error in the admission of evidence will not undermine a jury verdict unless the error affects substantial rights of a defendant. Rule 52(a), Fed.R.Crim.P.; Rule 103(a), Fed.R.Evid.
 
 
 128
 We cannot say that the district court abused its discretion in allowing introduction of the newspaper article and the tape recordings about the fire. We agree with the district court that this evidence was relevant to the issue whether defendants were using extortionate means to collect a debt. A reasonable person in Oldford's position would have understood Bonner's references to the fire and to the fate of the man in Upper Arlington as implying that harm would befall Oldford or his wife if Oldford's debt were not paid. As to whether, under Rule 403, the probative value was substantially outweighed by the danger of unfair prejudice, we believe that such danger was mitigated by the clear and effective limiting instructions that the district court gave. As to the newspaper article, we believe the district court was correct in recognizing that the absence of facts in the article that directly related to the facts before the jury lessened the likelihood that the jury would speculate that the defendants killed the man in Upper Arlington. Any error in admitting this evidence was, in any event, harmless. The testimony on Bonner's displaying a shotgun, Parker's telling Oldford that Bonner was planning to shoot Oldford in the leg, and Bonner's describing himself to Oldford as an enforcer established guilt beyond reasonable doubt.
 
 IV.
 
 129
 Bonner argues that the district court deprived him of his right to self-representation when it denied his motion to discharge his appointed counsel. The government responds, we believe correctly, that Bonner never asked to represent himself.
 
 
 130
 A dispute arose between Bonner and his counsel as to whether the tapes of Bonner's conversations with Oldford were accurate and as to Bonner's desire to have a voice analysis done on them. Additionally, Bonner complained to the district court that he had received only the transcripts of the tapes and had not heard the actual recordings. Lastly, Bonner complained that his attorney did not consult sufficiently with him. After hearing from Bonner's attorney on these areas of difference, the court recessed the trial to give Bonner an opportunity to consult with his attorney and to listen to the tapes.
 
 
 131
 We recognize that a defendant in a criminal trial has a constitutional right to defend himself. Faretta v. California, 422 U.S. 806, 819 (1975). This right does not, however, give a defendant who chooses to have an attorney the right to make "binding decisions of trial strategy...." Id. at 820. In exercising the right to self-representation, a defendant must knowingly and intelligently waive his right to representation. Id. at 835. Bonner's statements to the district court about his disagreements with counsel were equivocal as far as a supposed desire to represent himself was concerned; the district court apparently believed Bonner merely wanted replacement counsel, and we cannot say the court was wrong in this. There is no challenge to the effectiveness of the counsel Bonner had, and the fact that Bonner wanted a different lawyer provides no basis for disturbing his conviction.
 
 
 132
 Bonner contends also that the district court ought to have ordered a scientific analysis of the tape recordings and of the two pills that were introduced into evidence. A proper foundation was laid for the introduction of each of these items, and the district court did not abuse its discretion in admitting them.
 
 V.
 
 133
 Parker argues that the district court erred in not suppressing incriminating statements made at the time of his arrest and in not invalidating his consent to a search of his home. He argues that his use of cocaine before his arrest made his responses involuntary.
 
 
 134
 The district court held an evidentiary hearing on this matter. After hearing testimony from the arresting officers on Bonner's demeanor and his responses at the time of arrest, the court found that Bonner knowingly, voluntarily and intelligently waived his right to remain silent. We are in no position to second-guess the district court on this.
 
 
 135
 AFFIRMED.