**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank JOSEPH, Defendant-Appellant.**

No. 85–1144.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 3, 1985.

Decided Jan. 16, 1986.

Hugh M. Davis, Detroit, Mich., for defendant-appellant.

David J. McKeon, Maura Corrigan, Detroit, Mich., William C. Bryson, Dept. of Justice, Washington D.C., for plaintiff-appellee.

Before MARTIN and CONTIE, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

Frank Joseph appeals from his convictions for violation. of 18 U.S.C. §§ 894, 1962(c), (d). For the reasons that follow, the convictions pursuant to 18 U.S.C. §§ 894, 1962(c) are reversed and the conviction pursuant to 18 U.S.C. § 1962(d) is remanded to the district court for proceedings consistent with this opinion.

## I.

On March 21, 1984, defendant Frank Joseph was indicted in three counts for violation of 18 U.S.C. §§ 894, 1962(c), (d). Count I enumerated the § 1962(c) violations. This count alleged that Joseph, together with Thomas Tripp, Robert J. Doniere, Dean E. Knopp, Samuel Giordano, Anthony Palazzolo, Donald R. Christy and David G. Dewood, Jr., was engaged in an "enterprise" pursuant to 18 U.S.C. § 1961(4) for the purpose of engaging in violations of Ohio Rev. Code § 2915.02, Mich. Comp. Laws Ann. § 750.157a(b), .301, .314, 18 U.S.C. §§ 891–894, 18 U.S.C. § 1952, 18 U.S.C. § 1961(6), and 18 U.S.C. § 2421. As part of this "enterprise," the indictment listed twenty "unlawful debts," 18 U.S.C. § 1961(6), which the defendants had collected. Count I specifically alleged that Joseph had conspired to violate Michigan gambling laws and had unlawfully attempted to collect an extension of credit from Gerald Briskin, M.D., in violation of 18 U.S.C. § 894. Count II alleged that the defendants violated 18 U.S.C. § 1962(d) by conspiring to collect debts incurred in gambling schemes which violated Ohio and Michigan gambling laws. This conspiracy was allegedly effected through high stakes card games using a rigged deck. Count IV alleged that Joseph violated 18 U.S.C. § 894 by unlawfully attempting to collect an extension of credit from Gerald Briskin, M.D., by impliedly threatening to cause harm to Briskin if he failed to pay the extension of credit.

Joseph's counts were tried to the court September 5, 1984 to September 24, 1984. The following evidence was received at trial.

Robert Doniere testified that Joseph was involved in setting up a card game in which a jeweler, Joel Watnick, lost four or five thousand dollars. Doniere also stated that Joseph made unsuccessful attempts to lure a dentist from Michigan and a television salesman into card games.

Joel Watnick testified that Joseph introduced him to Doniere. Watnick claimed that Doniere induced him to attend a card game in which he lost three thousand dollars. He stated that Joseph was not at the game and that he paid the losses to Doniere.

In a proffer of testimony in chambers, Gerald Briskin testified that in the fall of 1980 he became involved in a card game with Frank Joseph, Larry Lang, and others including someone who looked like Thomas Tripp. After the card game Briskin wrote out an IOU for $154,000, half of which was Briskin's liability and the other half, Lang's. Briskin testified that Joseph was dealing, and that, at that time, he met Tony Palazzolo. Briskin stated that although he had not met Palazzolo before the card game, he "had heard vague rumors that he

was connected with what purported to be organized crime, that he was a gambler." On the evening of the game, Palazzolo gave Briskin his card and Briskin called him because he "thought that he might be influential," although he "had no facts regarding his connections." Further, "[h]e [Palazzolo] was the only person at that card game that was friendly." Briskin testified that he later contacted Palazzolo because "[h]e said he might be helpful in the matter, and I had known a cousin of his, which I had known prior to the time of the game, and Tony had been very friendly and he said if he could be helpful, call him, so I called him and we had dinner together." Briskin and Palazzolo discussed the debt and Palazzolo indicated that he would attempt to intervene. Later Briskin met with Joseph and Palazzolo at the Host Hotel at Metropolitan Airport. Palazzolo was "neutral," Briskin testified, and said little. Briskin testified:

Q What was the reputation of Mr. Palazzolo?

A Again, it was a vague kind of thing, and it was essentially that he had Mob connections and gambled.

Q What was Mr. Palazzolo's reputation, to your knowledge, regarding collection methods?

A I had no knowledge of that.

Q Did Mr. Palazzolo ever advise you that he was connected with what you call the Mob?

A No.

Q Did Mr. Joseph ever represent to you that Mr. Palazzolo was connected to anybody?

A No.

Q Did Mr. Joseph ever ask Mr. Palazzolo to sit down and talk with you concerning a gambling debt?

A Not in my presence.

Briskin indicated that he had treated a relative of Palazzolo some years earlier, and, therefore, told Palazzolo that he owed him a favor. Palazzolo never threatened Briskin, nor did Joseph. However, Joseph "was angry, he was demanding, he wanted to know what I was going to do about the money."

Under further examination by the court, Briskin testified that he went to Palazzolo because he thought Palazzolo could help him resolve his debt. Briskin testified that his knowledge of Palazzolo's reputation did not cause him to fear Joseph.

The district court found Briskin's testimony regarding Palazzolo's reputation inadmissible. The court held:

If Palazzolo's position as a member of the Mob put fear into him and this reputation supported any effort Joseph made to collect, then I think it would be clearly relevant and then we would have to go to the 403 weighing of prejudice against probative. But, if what he heard about the Mob had nothing to do with whether he would or would not pay Joseph, it is not relevant. So, therefore, I will sustain the objection and you may not ask the question.

In his in-court testimony, Briskin testified that in September 1980 Larry Lang invited him to a meeting to discuss investment in a casino in the Dutch Antilles. The meeting was held at an apartment in Southfield, Michigan. Joseph was playing poker when Briskin arrived. Lang introduced Briskin to Palazzolo. When Briskin questioned Lang about the investment, Lang asked Briskin to play his hand while he made a call. Briskin won some money then Lang resumed play. Later Lang asked Briskin to play his hand. Briskin received a strong hand, and, when the betting escalated, asked Lang to return to the game. Lang refused to return and Briskin resumed play. After Lang again refused to return, Briskin finished the hand and was beaten by Joseph. Lang and Briskin signed an IOU for $154,000 with each liable for half. Lang was upset and had to be restrained by Palazzolo who said something about "Frank Joseph was connected with the Josephs that had an investment in the Aladdin Hotel and don't get rough."

Briskin received a call from Joseph asking Briskin to come to his restaurant. Joseph asked Briskin to sign some blank

checks, which Briskin refused, and to provide a financial statement. Briskin took the position that the debt was Lang's, not his, but he did leave Joseph with a book contract worth $30,000. Briskin later called Palazzolo and met him for dinner at which time Palazzolo indicated "he would see what he could do." Joseph, Palazzolo, and Briskin met at the Host Hotel at Metropolitan Airport. Palazzolo was just an observer and Joseph was angry when Briskin denied the debt. Joseph and Briskin had further contacts but when Briskin could not come up with the money, Joseph said "forget it."

About the situation, Briskin testified: "I felt threatened but I was never really threatened. I was, you know, I was apprehensive and I was uncomfortable.... It was all in my own mind." Briskin stated that he was never overtly threatened. Further, "it was a very uncomfortable feeling to have someone calling and demanding money and I, you know, I just felt uncomfortable and it was to me an uncomfortable threatening kind of situation. I had no idea what was going to happen and the ambiguity and uncertainty of it created the sense of threat that I felt." Briskin testified that Joseph never threatened violence to his person. Joseph displayed his anger by his tone of voice and "[h]is movements became a little more obvious but that is all."

On September 24, 1984, the district court entered findings pursuant to Fed.R.Crim.P. 23(c). The court found Joseph guilty of attempting to collect an extension of credit by extortionate means pursuant to 18 U.S.C. § 894. The court noted that, in the recorded conversations, there was constant pressure by Joseph on Briskin to pay the debt. The court held that "[t]he test to be used is whether an ordinary person in Briskin's shoes would have been in fear of present or future violence. The test is an objective one, not a subjective one." The court found that the definition of "extortionate" in 18 U.S.C. § 891(7) had been met due to implicit threats of violence. Specifically,

[T]he court reaches this conclusion because of the intervention of Palazzolo in the matter, the bringing of Palazzolo into it, the references to the mob, the knowledge of Briskin that Palazzolo was a member of the mob, the repeated demands of Joseph for payment, the angry actions of Joseph, and Briskin's statement that he did feel threatened because of the ambiguity and uncertainty of the situation.

The court also found Joseph guilty of a substantive RICO violation pursuant to 18 U.S.C. § 1962(c). The court found that Joseph was associated with an enterprise which affected interstate commerce. The court found the requisite two predicate acts necessary for a pattern of racketeering activity in the violation of 18 U.S.C. § 894, and in the conspiracy to gamble in violation of Michigan law. The court likewise found Joseph guilty of conspiracy pursuant to 18 U.S.C. § 1962(d).

On appeal, Joseph challenges all three convictions. We consider these assignments of error in turn.

## II.

■ With respect to Joseph's conviction pursuant to 18 U.S.C. § 894, Joseph alleges that the district court erred in (1) considering Briskin's testimony of Palazzolo's mob connections after having ruled such inadmissible; (2) finding Joseph guilty when there was no evidence of a threat of bodily harm; and (3) refusing to dismiss the indictment where such alleged no overt threats of violence.

### A.

It is well settled that in a non-jury trial the introduction of incompetent evidence does not require a reversal in the absence of an affirmative showing of prejudice. The presumption is that the improper testimonial evidence, taken under objection, was given no weight by the trial judge and the Court considered only properly admitted and relevant evidence in rendering its decision.

*United States v. McCarthy,* 470 F.2d 222, 224 (6th Cir.1972). The admissibility of the evidence regarding Briskin's knowledge of Palazzolo's mob connections is not before this court. The district court plainly found the evidence inadmissible, never reversed that decision, and trial proceeded on that basis. The presumption of regularity referred to in *McCarthy* is clearly inapplicable since it is plain from the district court's findings that, in concluding that Joseph was guilty, the court relied on the evidence it had previously declared inadmissible. However, "[t]he admission of such evidence is deemed harmless if there is relevant and competent evidence to establish defendant's guilt in absence of the objectionable proof." *Id.; United States v. Bowdach,* 501 F.2d 220, 228 (5th Cir.1974), *cert. denied,* 420 U.S. 948, 96 S.Ct. 1831, 43 L.Ed.2d 426 (1975). Accordingly, we examine the evidence to determine whether such independent proof of guilt exists.

### B.

The applicable standard for reviewing the sufficiency of the evidence to support a criminal conviction is whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560.

*United States v. Spears,* 631 F.2d 114, 117 (9th Cir.1980). "This test applies to both jury and bench trials." *Id. But see United States v. Jennings,* 726 F.2d 189, 190 (5th Cir.1984).

18 U.S.C. § 894(a)(1) provides:

Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means (1) to collect or attempt to collect any extension of credit ... shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

"In order to convict a defendant under 18 U.S.C. § 894, a trier of fact must find that: (1) a collection or attempted collection was made, (2) extortionate means were used, and (3) the defendant knowingly participated in these actions." *United States v. Touloumis,* 771 F.2d 235, 238 (7th Cir. 1985); *Joseph v. Algemene Bank Nederland, N.V.,* 592 F.Supp. 141, 145 (W.D.Pa. 1984). Principally at issue in this appeal is whether Joseph employed "extortionate means," defined in 18 U.S.C. § 891(7) as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

Acts or statements constitute a threat under 18 U.S.C. § 891(7) "if they instill fear in the person to whom they are directed *or are reasonably calculated to do so in light of the surrounding circumstances....*" *United States v. Curcio,* 310 F.Supp. 351, 357 (D.Conn.1970) (Timbers, J.) (emphasis added). It is this "calculated" use of threatening gestures or words to collect credit extensions which Congress has made criminal. Actual fear need not be generated, so long as the defendants intended to take actions which reasonably would induce fear in an ordinary person. In other words, it is the conduct of the defendant, not the victim's individual state of mind, to which the thrust of the statute is directed. We have no doubt that Congress meant to protect not only the weak and timid from extortionate threats, but the strong and intrepid as well.

*United States v. Natale,* 526 F.2d 1160, 1168 (2d Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976) (footnote omitted). *See United States v. Pacione,* 738 F.2d 567, 572 (2d Cir.1984); *United States v. Gambino,* 566 F.2d 414, 419 (2d Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). "Fear must be the intended result of the defendant's act.... The threat must be 'knowingly' made." *United States v. Sears,* 544 F.2d 585, 588 (2d Cir.1976).

The evidence in this case is clearly insufficient to support the conviction. Palazzolo was never a threat, implicitly or

otherwise, to Briskin as evidenced by Briskin's attempt to use Palazzolo to his advantage. Briskin's generally friendly relationship with Palazzolo reflected no circumstances which would induce fear in an ordinary person. There is no evidence that Palazzolo was acting pursuant to Joseph's direction or that either Joseph or Palazzolo made any kind of threats against Briskin. There is no evidence that Joseph intended to place Briskin in fear. The anxiety generated by the discussions involving the gambling debt was simply the ordinary anxiety felt by one who is obligated to pay a debt he feels was unjustly incurred. A demand for money is simply not a threat. The fact that Joseph later told Briskin to forget the debt without making any overt threats negates any inference that Joseph's prior inquiries regarding the debt had been implicit threats. In the absence of evidence to support the conviction independent of that declared inadmissible by the district court, the conviction pursuant to 18 U.S.C. § 894 must be reversed.

### C.

■■■ Joseph alleges that the failure of Count IV of the indictment which alleged that Joseph threatened to harm Briskin to specify that Joseph threatened to do so by "use of violence" or "other criminal means," requires reversal. Count IV alleges:

> During the Summer and Fall of 1980, the dates unknown, in the Eastern District of Michigan, Defendant Frank R. Joseph did knowingly, wilfully and unlawfully attempt to collect an extension of credit from Gerald Briskin, M.D., by impliedly threatening to cause harm to the person of Gerald Briskin if he failed to pay said extension of credit in violation of Title 18, United States Code, Section 894.

When an indictment is challenged for the first time only after verdict, it will be liberally construed in favor of its sufficiency, and there will be no reversal, in the absence of prejudice, "unless the indictment cannot within reason be construed to charge a crime." *United States v. Hart,*

640 F.2d 856, 857–58 (6th Cir.), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2334, 68 L.Ed.2d 853 (1981). It is well settled that an indictment is sufficient if it fairly apprises the defendant of the charges against him. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). It is not necessary that the indictment use the precise language used in the statute, as long as the indictment, by fair implication, alleges an offense recognized by the law. *United States v. Reed,* 721 F.2d 1059, 1061–62 (6th Cir.1983). Although the indictment might have been more complete in alleging the manner in which Joseph threatened to harm Briskin, we find that it fairly put Joseph on notice of the charges against him.

### III.

■■■ Our conclusion that Joseph's conviction on the 18 U.S.C. § 894 count must be reversed, excludes one of the predicate acts relied on by the district court in convicting Joseph pursuant to 18 U.S.C. § 1962(c). Accordingly, Joseph's conviction pursuant to 18 U.S.C. § 1962(c) must be reversed.

We reach a different conclusion with respect to the conspiracy count, 18 U.S.C. § 1962(d). For a conspiracy conviction it is not necessary to prove that the defendant agreed to personally commit the requisite acts, but only that he agreed that another violate § 1962(c) by committing two acts of racketeering activity. *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.), *cert denied,* — U.S. —, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Carter,* 721 F.2d 1514, 1529–31 (11th Cir.), *cert. denied sub nom. Morris v. United States,* — U.S. —, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *United States v. Brooklier,* 685 F.2d 1208, 1220 (9th Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983). Therefore, even though we find that one of the predicate acts relied on by the district court was insufficient, this does not foreclose a finding of guilt since Joseph may have agreed that others would commit predicate acts. Accordingly, we remand this case to the district court to de-

termine, in light of our opinion, whether there is sufficient evidence to support the conspiracy conviction.

█ Joseph argues, with respect to the conspiracy conviction, that conspiracy to gamble cannot serve as a predicate act within 18 U.S.C. § 1961(1)(A) to support a conspiracy conviction pursuant to 18 U.S.C. § 1962(d). 18 U.S.C. § 1961(1)(A) provides that " 'racketeering activity' means (a) any act ... involving ... gambling ... which is chargeable under State law and punishable by imprisonment for more than one year."

We rejected a similar argument in *United States v. Licavoli,* 725 F.2d 1040, 1044–45 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984), and see no reason to reconsider our decision now. Conspiracy to gamble on its face falls within 18 U.S.C. § 1961(1)(A)'s definition of racketeering activity. Conspiracy to gamble is "an act ... involving ... gambling." *See Licavoli,* 725 F.2d at 1045, and cases cited therein.

Accordingly, the judgment of the district court is REVERSED with respect to Counts I and IV, and REMANDED with respect to Count II for further proceedings consistent with this opinion.