UNITED STATES of America,
Plaintiff–Appellee,

v.

Joan McCOY, Defendant–Appellant.

No. 86–1902.

United States Court of Appeals,
Sixth Circuit.

Argued July 30, 1987.

Decided Jan. 19, 1989.

Rehearing and Rehearing En Banc
Denied March 14, 1989.

William T. Street argued, Klimaszewski & Street, Saginaw, Mich., for defendant-appellant.

James Brunson argued, Asst. U.S. Atty., Bay City, Mich., for plaintiff-appellee.

Before KENNEDY and NELSON, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

With two co-defendants, appellant Joan McCoy was tried and convicted on three counts of reentering a military installation, in violation of 18 U.S.C. § 1382, after having been ordered by the commanding officer not to reenter.[1] The alleged reentries

---

1. Section 1382 reads as follows:

"Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or

*Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been* removed therefrom or *ordered not to reenter* by any officer or person in command or charge thereof—

occurred when Mrs. McCoy stationed herself in the driveway of the main entrance of Wurtsmith Air Force Base to pass out leaflets to people entering the base. She did not interfere with anyone's access to the base, as we infer from the record, and conducted herself in an orderly and peaceful manner at all times pertinent to our inquiry.

Sitting without a jury, the district court found the driveway to be "part of the military base...." Mrs. McCoy's main argument on appeal is that the government failed to sustain its burden of proving that the driveway was in fact part of the base. And even if the driveway was within the confines of the base, she argues, the refusal to let her distribute leaflets there restricted the exercise of her First Amendment rights unreasonably.

Upon review, we conclude that the evidence before the trial court was sufficient to support the court's finding that the driveway was part of the military base. That being the case, we do not believe that the Air Force had any constitutional duty to make the driveway available for the dissemination of leaflets by civilians who had been barred from the base under § 1382.

I

Wurtsmith Air Force Base (formerly Oscoda Army Air Field) is a federal military installation located in Iosco County, Michigan. The main entrance to the base is situated on the west side of a county highway known as Highway F–41.

Iosco County does not hold a fee interest in the land occupied by the highway. The County Road Commission's Director of Surveys, called as a witness by the defendants, testified that the federal government apparently had granted a right-of-entry to the State Highway Department for construction of the highway, as had the State Conservation Department. (Certain lease agreements received in evidence suggest that the United States leases the base from

Shall be fined not more than $500 or imprisoned not more than six months, or both."

the State of Michigan; the land may at one time have come within the jurisdiction of the Conservation Department.) The Highway Department subsequently relinquished its right-of-entry to the county. It is clear, as the Director of Surveys testified, that the county does not "own" the road. The Highway Department "couldn't give us the property," he explained, "because they didn't own it. All they had was a highway easement release, which was a right of entry. All we have today is the same instrument."

The government's evidence established without contradiction that Wurtsmith Air Force Base is not an "open base." Members of the public who wish to come on the base are supposed to request permission at a manned gatehouse located at the main entrance.

Security at the base, it would appear, has not always been perfect. In October of 1983, according to the testimony of a co-defendant, Mrs. McCoy and 16 others participated in a "public vigil" conducted on the airstrip of the base. The purpose of occupying the airstrip was to protest the deployment of missiles on the base and in Europe.

The 1983 incident resulted in Mrs. McCoy and her co-defendants receiving letters from the base commander barring them from reentering the base. The letter to Mrs. McCoy, dated 23 October 1983 and signed by her to acknowledge receipt, cited 18 U.S.C. § 1382 and ordered Mrs. McCoy not to reenter the confines of the installation without the written permission of the commander or his designee.

Mrs. McCoy received a second such letter in June of 1984. She acknowledged from the witness stand that prior to March of 1986 "I was barred twice" from entry onto Wurtsmith Air Force Base. Mrs. McCoy does not contend that there was any defect in the bar letters, or that their issuance was unreasonable or unlawful. And Mrs. McCoy could not profess ignorance of the

(Emphasis supplied.)

law; the letters explained § 1382 to her, and the record indicates that she had a prior conviction under the statute in any event.

The first of the three acts of alleged trespass involved in the present case occurred on March 9, 1986, at a time when Mrs. McCoy and her co-defendants were engaged in what they described as "monthly leafletting" at the base. Mrs. McCoy testified that as she was passing out her leaflets on the west side of Highway F–41 in a paved area that she believed was within the public right-of-way, a person from the military approached her and informed her that she was on base property. He instructed her to leave—and, as she conceded, he gave her an opportunity to do so. She did not leave, but continued to hand out her leaflets from the spot that she had been told was base property. She was then taken into custody by military personnel.

Following this incident the Air Force decided to have a white line painted across the driveway at the main entrance to identify the boundary of the base. The line was painted by military prisoners working under the direction of a master sergeant. Instructions on where the line was to be painted "got messed up between the master sergeant and the prisoners," according to the base operations officer, a Captain Kerby, and the prisoners did their painting in the wrong place. This happened on or about May 1, 1986, according to the testimony.

To correct the mistake, Captain Kerby had the line painted over with black paint and had a new line painted where he had been told the actual boundary was. He had intended from the beginning that the line be placed there. The correction was made on or about May 8, 1986, and the new line was in place before Mrs. McCoy's next visit.

That visit occurred on May 11, 1986, a day referred to in Mrs. McCoy's testimony as "Mothers' Peace Day." Mrs. McCoy testified that on this occasion she not only saw the freshly painted line, she "straddled it" in the course of passing out leaflets for an hour and a half or more. From time to time she stepped over the line in order to avoid traffic, Mrs. McCoy said, and in handing a leaflet to the occupant of a car that was in motion, she would sometimes step over the line in her "excitement." Asked if she "did at times go within the [base] confines," her answer was "yes." When asked by the court if she continued to try to do the same thing after realizing that occasionally she had to step off the line, Mrs. McCoy again answered "yes."

It is undisputed that on May 11, as on March 9, Mrs. McCoy was asked to leave after Captain Kerby thought she had crossed the boundary of the base. Reading aloud from a prepared statement, Captain Kerby told Mrs. McCoy that she was on Wurtsmith Air Force Base without the permission of the base commander and would have to leave immediately. As on March 9, she did not leave; again she was taken into custody.

On June 8, 1986, Mrs. McCoy again stationed herself in the driveway at the entrance to the base. Again she was instructed to leave, again she was given an opportunity to step away from the area asserted to be base property, again she stood her ground, and again she was arrested. At no time, she testified, did she have any difficulty understanding the instructions to leave.

Although the legal status of the spot where Mrs. McCoy chose to pass out her leaflets is disputed, its physical position is not. The location is marked with the letter "C" on Exhibit 8, an aerial photograph that depicts Highway F–41, the gatehouse, two driveways that run between the gatehouse and the highway, and a grass-covered "island" that lies between the two driveways. The relationship of the key elements in the photograph is shown in the following diagram:

As indicated by the diagram, there is a turning lane on the west side of the highway for use by southbound traffic preparing to turn in at the driveway to the gatehouse. A painted line—a line that marks the boundary of the base, according to Captain Kerby—separates the turning lane from the through traffic lane. The painted boundary line did not extend across the driveway on March 9, but it did on May 11.[2] Captain Kerby testified that on March 9, 1986, Mrs. McCoy was positioned in the driveway to the west of the then unextended line at the point marked "C." She has never disputed that this was the point at which she was standing on March 9. Moreover, as we have seen, she admitted that on May 11, after the line had been extended across the driveway, she knowingly stepped to the west of the line in the course of her leafletting activities. There is no controversy about her having done the same thing on June 8.

The position of the island, which was emphasized in the findings of the trial court, is of particular interest. The island extends from the gatehouse all the way to the boundary line, making it impossible for traffic heading south in the turning lane to continue to move in the same direction without turning. The island was plainly

part of the base. Prominently displayed on the island was a large sign bearing the legend reproduced below:

# WARNING

---

## U.S. Air Force Installation

It is unlawful to enter this area without permission of the Installation Commander.
Sec. 21, Internal Security Act of 1950; 50 U.S.C. 797

While on this Installation all personnel and the property under their control are subject to search.

This area is patrolled by military working dog teams.

Because the island extended all the way to the edge of the southbound traffic lane of the highway, a person standing in the driveway next to the island at the point marked "C" on the diagram would not normally have to worry about being hit by southbound traffic coming from the turning lane on the other side of the driveway. The island would also afford a person standing in that location a measure of protection from traffic moving in the through lane. It would thus be fair to say that the reason Mrs. McCoy found it safer to stand in the driveway at location "C," with the island to the south and west of her, instead of standing two or three feet to the east, is that in the former location she would be on the base, while in the latter she would be in the southbound traffic lane of the highway.

After considering all the evidence, the district court found not only that the driveway was part of Wurtsmith Air Force Base, but that Mrs. McCoy and her two co-defendants had been ordered by the person in command not to reenter the base; that each defendant did, in fact, reenter the base on three separate occasions in three different months; that each defendant was given actual notice that she was considered to be upon a military base; and that each

---

**2.** The broken line in the diagram shows where, on May 1, the prisoners painted in the line that was painted out on May 8.

defendant nonetheless failed to leave, although afforded a reasonable opportunity to do so. On these findings the district court, in the person of Judge James P. Churchill, found each defendant guilty on three counts of violating 18 U.S.C. § 1382.

Only Mrs. McCoy has appealed. Mrs. McCoy was sentenced to serve a total of 12 weeks in prison, but Judge Churchill made it clear to her that if she wanted to exhaust her appeal rights before serving her sentence, she could do so by posting bond. Mrs. McCoy elected not to wait, and served her time before the briefs were filed in this court. It is now up to us to tell her whether she made a mistake in promptly accepting the punishment that the district court felt constrained to impose.

She made no mistake.[3] Her error, if any, was in stepping over the line in the first place, not in accepting her punishment for doing so.

## II

Does the driveway at the main entrance of Wurtsmith Air Force Base constitute part of a military installation, as the trial court found?

■ The prosecution did not prove to the satisfaction of the trial court that the United States holds a leasehold or fee interest in any of the land occupied by the base, and there was no attempt to prove that the portion of the driveway where Mrs. McCoy passed out her leaflets lay outside the right-of-way "released" for Highway F–41. No such proof was necessary, in our view.

The existence of Wurtsmith Air Force Base does not depend on the strength of the government's legal title. Like the famous stone that Dr. Johnson kicked in refuting Bishop Berkeley, Wurtsmith Air Force Base exists. Anyone who looks at the base can see that it exists. It has existed, as the evidence showed, since World War II. It is undisputed that the government has enjoyed a possessory interest in the base for decades. The source of that interest is immaterial as far as the issue before us in this case is concerned.

If it were known that the military airstrip which was occupied by Mrs. McCoy and her fellow demonstrators in 1983 had been built on land owned outright by Iosco County, instead of on land leased from the State of Michigan by the United States, the airstrip would still have been part of a military installation possessed and operated by the United States—and it would still have been off-limits to anyone barred from the base under § 1382.[4] Had it been

---

3. Nor did Mrs. McCoy's appellate counsel make a mistake, in our view, by failing to argue that the three misdemeanors with which his client was charged ought to have been tried to a jury. Even contempt of court has been held to be a "petty offense" when the penalty actually imposed does not exceed six months, and "petty contempt like other petty criminal offenses may be tried without a jury...." *Taylor v. Hayes,* 418 U.S. 488, 495–96, 94 S.Ct. 2697, 2701–02, 41 L.Ed.2d 897 (1974). *Cf. United States v. Smyer,* 596 F.2d 939, 942 (10th Cir.1979) ("Where the actual sentence for multiple petty offenses is less than six months, there is no jury trial right.").

The defendants in *Smyer* could have been imprisoned for up to 990 days, but their actual sentence—imposed after a bench trial for 11 counts of violating the Antiquities Act—came to only 90 days. The defendant in *Hayes*—convicted on multiple counts of contempt—received sentences which, if served consecutively, would have amounted to several years. Because the sentences in *Hayes* were to be served concurrently, however, and the penalty actually imposed did not exceed six months

in jail, "trial by jury was not required." 418 U.S. at 496, 94 S.Ct. at 2702. Mrs. McCoy's actual sentence was less than the actual sentences in *Smyer* and *Hayes,* and, just as in those cases, we think it is clear that trial by jury was not required.

4. In *United States v. Mowat,* 582 F.2d 1194, 1206 (9th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1976), "[t]he parties agreed that the Government was required to prove, as an element of the offense, absolute ownership or the exclusive right to the possession of the property upon which the violation occurred." There has been no corresponding agreement in the instant case, and if proceedings under 18 U.S.C. § 1382 are comparable to trespass actions, centuries of legal history support the government's refusal to concede that anything more than a possessory interest had to be shown.

No less a scholar than James Barr Ames has written that "any possessor may have trespass *quare clausum fregit.*" Ames, *Lectures on Legal History,* 227. Dean Ames notes that "as early as the twenty-second year of Charles I" the case of

shown that the driveway where Mrs. McCoy passed out her leaflets in 1986 was built on land owned by the county, similarly, the driveway would have been no less a part of the base.

But the main driveway of Wurtsmith Air Force Base was not built on land owned by the county. The county's right-of-way may have overlapped the driveway and the adjacent island, but a mere right-of-way, as the trial court noted, "is less than ownership...." The typical Michigan suburbanite owns the portion of his driveway that lies between the sidewalk and the street, even though that portion of the driveway is burdened by a local government's right-of-way. The right-of-way may cover the suburbanite's entire tree lawn, along with such of the driveway as lies within the tree lawn, but the right-of-way is less than ownership in fee, and the driveway belongs to the homeowner. As far as Wurtsmith Air Force Base is concerned, similarly, Judge Churchill said "there isn't any question that the entire area up to at least the center of the road, if not beyond, is a part of the military base...." As a matter of real estate law, that proposition would seem unassailable. See *Loud v. Brooks*, 241 Mich. 452, 217 N.W. 34 (1928).

This does not necessarily mean, of course, that Mrs. McCoy could have been convicted under § 1382 for simply driving past the base in the southbound lane of Highway F–41. See *United States v. Watson*, 80 F.Supp. 649 (E.D.Va.1948). See also *United States v. Albertini*, 472 U.S. 675, 698–99, 105 S.Ct. 2897, 2911–12, 86 L.Ed.2d 536 (1985), where Justice Stevens, writing in dissent, suggested that Congress could not have intended to impose criminal liability on a hypothetical person who, after being barred from Hickam Air Force Base, left Honolulu International Airport in a flight which used the main runway of that airport, a portion of which runway lies in-

side Hickam. "The use of these military lands for the limited public purposes for which they have been set aside," Justice Stevens wrote, "does not involve the bold defiance of authority that is foreseen by the structure of the statute and reflected in its legislative history."

But the authorities at Wurtsmith Air Force Base made no attempt to prevent Mrs. McCoy from using the southbound traffic lane of Highway F–41 for the limited public purpose for which it had been set aside. On the contrary, they caused a line to be painted at the point where the driveway of the base meets the through traffic lane, and they told Mrs. McCoy, in effect, that she was free to go thus far, but no farther. The driveway area west of the boundary line had not been set aside as a public forum, and Mrs. McCoy's insistence on crossing the line to use the driveway for that purpose involved precisely the sort of "bold defiance of authority" that was missing in Justice Stevens' hypothetical airline passenger case.

From a political or religious standpoint, Mrs. McCoy's defiance of authority may seem wholly admirable—and even people who disagree with the view that world peace would be enhanced if the United States gave up its nuclear arms can admire the spirit that Mrs. McCoy displayed in defying an authority she considers misguided. But it seems obvious to us from a legal standpoint, as it seemed obvious to Judge Churchill, that when Mrs. McCoy chose to cross the line separating the through traffic lane from the entrance to the military installation, she chose to break the law.

The case at bar presents, in many ways, a mirror image of the factual situation in *United States v. Parrilla Bonilla*, 648 F.2d 1373 (1st Cir.1981). The defendants in that case entered upon a U.S. Navy installation's beach in an area where there was

---

*Johnson v. Barrett*, Al.10, established that "an intruder upon the King's possession might have an action of trespass against a stranger...." *Id.* Cf. *Osway v. Bristow*, 10 Mod. 37, from the tenth year of Anne, quoted by Dean Ames as holding that "a possessory right is sufficient to maintain an action of trespass." Michigan has long since

expressed agreement with this centuries-old common law rule. Cf. *Gilbert v. Kennedy*, 22 Mich. 5, 16–17 (1870) ("Where a trespass consists of a single act, and the plaintiff proves his possession, he may usually rest there"). We see no reason to rewrite the law of trespass at this late date.

no "visible boundary marking from which to infer the Navy's closing of the installation to outsiders." *Id.* at 1378. Here, by contrast, the Air Force put down a clearly visible boundary marking so that there could be no possible doubt that the area west of the line was closed to outsiders. The message conveyed by the line was reinforced, as far as Mrs. McCoy was concerned, by Air Force personnel telling her to her face that "[y]ou are on a United States military reservation," and "you are hereby ordered to leave." If the government was required to show knowledge by Mrs. McCoy that her entry "was, in fact, prohibited," see *Parrilla Bonilla,* 648 F.2d at 1377, we are certainly in no position to quarrel with Judge Churchill's findings that the driveway area was "within the control of the military" and that "[a]nybody has to have their head in the sand not to see it, particularly after they have been told again and again and again."

In *Parrilla Bonilla* the defendants' conviction was overturned on appeal because the government failed to prove that the defendants knew they did not belong on the beach. The only sign in that case said "YOU ARE NOW A GUEST ON THIS U.S. MILITARY RESERVATION. ENJOY YOURSELF AND CLEAN UP AFTER YOURSELVES." *Id.* at 1380. But the sign that Mrs. McCoy confronted as she walked across the highway toward the island at the entrance to Wurtsmith Air Force Base not only warned her that it was "unlawful to enter this area without permission of the Installation Commander," it punctuated the warning with a none-too-subtle reference to "military working dog teams." This was obviously a "Keep Out" sign, not a "Be Our Guest and Enjoy Yourself" sign.

In *Parrilla Bonilla* "there was no evidence that [the Navy] warned appellants to leave the beach prior to making the arrests." *Id.* at 1379. Mrs. McCoy, by contrast, was repeatedly warned to leave the driveway. In *Parrilla Bonilla* the government failed to show that the defendants had crossed the high tide line, or "brim line," that the government's evidence indicated was the *de facto* boundary of the

base. In the case at bar, by contrast, Mrs. McCoy admitted she had stepped over the *de facto* boundary, and the trial court accepted her testimony.

In their factual aspect, the findings made by Judge Churchill are beyond attack on appeal. Here, as in *United States v. Joseph,* 781 F.2d 549, 553 (6th Cir.1986), "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed. 2d 560 (1979)). If the task of this court is to determine "whether or not the district judge's findings of fact are 'clearly erroneous,'" see *United States v. Atwell,* 570 F.2d 650, 652 (6th Cir.1978), and *United States v. Mowat,* 582 F.2d 1194, 1202–03 (9th Cir.), *cert. denied,* 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978), the task is an easy one; in no way are the findings of fact that Judge Churchill made in this case "clearly erroneous." After a careful review of the record, we think they were clearly correct.

### III

■ The remaining issue that Mrs. McCoy asks us to decide is one that her counsel frames thus:

"Where there was undisputed testimony that the military base commander erased a painted boundary line where previous civilian demonstrations had been conducted, and shifted that boundary line so as to place persons engaged in leafletting into the flow of vehicle traffic along the shoulder of a public highway, was this an unreasonable restriction upon the exercise of First Amendment rights?"

On the record before us, and given the decisions of the United States Supreme Court in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and *United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), there is only one possible answer to this question: No.

Mrs. McCoy's brief complains that "[t]he District Court below did not rule upon the reasonableness or unreasonableness of this shifting of the boundary line by the military." But the undisputed testimony leaves no room for doubt as to the reason why the boundary line that had been painted in after Mrs. McCoy's first trespass in the driveway was painted out and shifted to the shoulder of the public highway before her second trespass; the line was promptly moved because the military prisoners and master sergeant responsible for painting it misunderstood their instructions and put it in the wrong place. It has never been controverted that the line was shifted in order to put it on what the military authorities had always considered to be the true boundary of the base, and no one asked the district court to "rule" on this obvious fact. There was no need for the district court to address the "reasonableness" of informing the world—including people who, unlike Mrs. McCoy, had not been informed verbally—precisely where the military authorities thought the boundary of the base was located.

From a safety standpoint, it might have been preferable if the line had been left in the wrong place and if the demonstrators had been permitted to stand on the portion of the driveway that lies between the misplaced line and what the authorities considered to be the actual boundary of the base. But "[m]ilitary bases generally are not public fora," as the Supreme Court noted in *Albertini*, 472 U.S. at 686, 105 S.Ct. at 2905; and we reject the notion that the driveway of Wurtsmith Air Force Base had to be turned into a public forum so the county officials would not have to decide whether to let their highway be used for that purpose.

"The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens," as Justice Stewart wrote in *Greer*, is a notion that is "historically and constitutionally false." 424 U.S. at 838, 96 S.Ct. at 1217. The Constitution of the United States speaks explicitly of the mission of places like Wurtsmith Air Force Base, and that mission is not to provide public forums; it is "to provide for the common defence." See *Greer, id.*

There are, to be sure, cases where the military has abandoned its right to control who comes on the streets of its installations. One such case was *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), which involved a Ft. Sam Houston thorough fare called New Braunfels Avenue. " 'New Braunfels Avenue was a completely open street,' " and "the military had not only abandoned any right to exclude civilian vehicular and pedestrian traffic from the avenue, but also any right to exclude leafletters...." *Greer*, 424 U.S. at 835, 96 S.Ct. at 1216 (quoting *Flower*, 407 U.S. at 198, 92 S.Ct. at 1843).

The record of the case before us affords no conceivable basis for supposing that the streets and driveways of Wurtsmith Air Force Base had been "abandoned" to civilian pedestrian traffic and leafletters. Unlike Ft. Sam Houston—and unlike Ft. Dix, the installation involved in *Greer*—Wurtsmith is a closed base, not an open one. Unlike Ft. Dix, the main entrances of which were not normally guarded and one of which had a sign saying "Visitors Welcome," *Greer*, 424 U.S. at 830, 96 S.Ct. at 1214, Wurtsmith Air Force Base has a main entrance that *is* normally guarded—and the Wurtsmith entrance has a sign which hardly falls in the "Visitors Welcome" category.

Unlike the defendant in *Albertini*, who entered Hickam Air Force Base during an annual open house, Mrs. McCoy was not standing on the driveway of Wurtsmith Air Force Base pursuant to invitation; she was standing there in open defiance of repeated orders to leave. If, as the Supreme Court held, the streets of the military installations in *Greer* and *Albertini* had not been abandoned to leafletters, it is simply not arguable that the main entrance of Wurtsmith Air Force Base had been so abandoned.

Had the entrance to Wurtsmith been turned into a public forum, the base commander could still have adopted reasonable regulations to govern the time, place, and manner of distributing leaflets there. But contrary to the assumption on which Mrs. McCoy's argument rests, the base commander was under no constitutional duty to adopt any time, place, and manner regulations at all—reasonable or unreasonable—for an area that most assuredly is not a public forum and never has been. The mere fact that Mrs. McCoy would have preferred it to be a public forum did not obligate the commanding officer to give up his "historically unquestioned power ... summarily to exclude civilians from the area of his command." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 893, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

■ Even if the entrance to Wurtsmith Air Force Base had been a public forum, finally, Mrs. McCoy would still not have been entitled to distribute leaflets there. Unlike the general public, Mrs. McCoy was the recipient of two "bar letters" excluding her from the base under the authority of 18 U.S.C. § 1382. Unlike the defendant in *Albertini*, who had received his bar letter some nine years before he accepted the commander's invitation to attend the annual open house at Hickam Air Force Base, Mrs. McCoy had received her most recent bar letter less than two years before she attempted to create her own open house at Wurtsmith. If it was lawful for the Air Force to prevent Mr. Albertini from peacefully passing out leaflets at Hickam during the open house there—and the Supreme Court held that it was—it necessarily follows that the Air Force could lawfully prevent Mrs. McCoy from passing out leaflets within the confines of Wurtsmith Air Force Base.

The convictions are AFFIRMED.

1. 18 U.S.C. § 1382 provides:

Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or

CELEBREZZE, Senior Circuit Judge, dissenting.

Unlike the majority, I believe that the government must prove that it holds the legal right to exclude individuals from the turning lane of Iosco County Highway F–41 before it may maintain what is essentially a trespass action under 18 U.S.C. § 1382[1] against Appellant for stepping over the military's unilaterally drawn "boundary." Because in my view the proof at trial failed to establish beyond a reasonable doubt that the government held the requisite property interest, I would reverse Appellant's conviction. Additionally, I believe that the Appellant was denied her right to a jury trial in violation of Article III and the Sixth Amendment. This deprivation of a fundamental constitutional guarantee provides an independent reason to reverse. Accordingly, I respectfully dissent from the decision of my distinguished colleagues.

## I.

The majority concludes that the Appellant was on the property of Wurtsmith Air Force Base. I believe, however, that the trial record was so confusing as to the base boundary that no reasonable trier of fact could conclude beyond a reasonable doubt that the Appellant was present within the confines of the base. The majority aptly describes the prosecution's presentation at trial:

The prosecution did not prove to the satisfaction of the trial court that the United States holds a leasehold or fee interest in any of the land occupied by the base, and there was no attempt to prove that the portion of the driveway where Mrs. McCoy passed out her leaflets lay outside the right-of-way "released" for Highway F–41.

Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof—

Shall be fined not more than $500 or imprisoned not more than six months, or both.

Contrary to the majority conclusion that the nature of the government's property interest was "immaterial," I believe that such proof was in fact essential to the government's case.

Section 1382 clearly requires for conviction that the defendant reenter or be found within a military reservation. Several courts have interpreted this provision to require that the government must prove "absolute ownership or the exclusive right to the possession of the property upon which the violation occurred." *United States v. Mowat*, 582 F.2d 1194, 1206 (9th Cir.), *cert. denied*, 439 U.S. 967, 99 S.Ct. 458, 58 L.Ed.2d 426 (1978); *United States v. Packard*, 236 F.Supp. 585 (N.D. Cal.), *aff'd*, 339 F.2d 887 (9th Cir.1964). This element of the offense received further elaboration in *United States v. Watson*, 80 F.Supp. 649 (E.D.Va.1948):

> The Court is of the opinion that the United States must show an absolute ownership, or an exclusive right to the possession, of the road, in order to enforce the commandant's interdiction of the defendant. To punish an infraction of the order, as an offense under title 18, section 1382, U.S.C.A., proof of criminal jurisdiction of the road alone was not enough. Sole ownership or possession, as against the accused, had to be in the United States or there was no trespass.

*Id.* at 651. Thus, the United States must prove that it holds the "exclusive right to the possession" of the land upon which the Appellant was arrested in order for the Appellant to be convicted under section 1382. The "right" to possession clearly requires more than the assertion of military authority over the turning lane of Highway F–41, which the majority finds so persuasive; the "right," in my view, must derive from the government's legal title to the property, either in fee or by leasehold.

Examining the record in the light most favorable to the prosecution, as we must, *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Joseph*, 781 F.2d 549, 553 (6th Cir.1986), I conclude that the United States failed to present evidence upon which a reasonable trier of fact could conclude beyond a reasonable doubt that the Appellant was "found within" the military installation.

As the majority notes, certain documents received into evidence "suggest" that the government leases Wurtsmith Air Force Base from the State of Michigan.[2] Without further explanation, however, it is not immediately apparent from these documents that the government's putative leasehold includes the land adjacent to the base on which Highway F–41 is located.[3] The documents evidently give the government an interest in some property, but the property is set forth in terms of legal descriptions of land that require expert explanation for a proper understanding. The only explanatory testimony offered by the government, however, was that of Joan Shepard, the civilian real estate officer at Wurtsmith. Unfortunately, Ms. Shepard's testimony did very little to clarify the boundaries of the base. She was obviously confused and ill-equipped to give legal opinions as to the documents in her control. Regarding Shepard's confused testimony Judge Churchill stated, "I find that the government's so called expert witness was far from an expert. I want to say this. My findings are not based upon giving her any expertise whatsoever." The prosecution's sole witness regarding the base's property interest was thus totally discredited and her testimony deemed useless; the documents pertaining to the government's property interest were never adequately explained and completely lacking in testi-

---

**2.** The documents included (1) a purported lease between the State of Michigan and the United States (Government exhibit 10), (2) a supplemental agreement extending the lease (Government exhibit 11), and (3) a permit whereby the Army granted the state of Michigan an easement for a highway (Government exhibit 12).

**3.** The majority's observation that the "existence of Wurtsmith Air Force Base does not depend on the strength of the government's legal title" misses the point. Appellant has never claimed that the base does not exist; rather, she challenges the government's right to unilaterally claim dominion over property apparently outside the base confines. In my view, her challenge is well taken.

monial foundation.[4] The government, therefore, failed to prove that Highway F–41, or at least the disputed turning lane, was within the military reservation.

Ultimately, the district court resolved the property line issue by deferring to the judgment of air base personnel as to the boundary line when the court stated, "they [defendants] were told by the government —it shouldn't have been necessary, but it was, that you're on a military reservation, get off." The majority here adopts similar reasoning. However, a blind yet good faith assertion by military personnel as to the boundary of a military reservation does not suffice to establish the critical element of a section 1382 violation. Such assertions by the government stating the scope of their property dominion may deter a majority of the general public from entering certain property, but such territorial claims must be substantiated beyond a reasonable doubt at trial to convict the Appellant. I am similarly unpersuaded by the majority's reliance on the physical layout of the gate area. Although a person standing in the turning lane of Highway F–41 could not help noticing that a military base loomed immediately to the west, such an observation is not conclusive proof that the military had the right to possess part of a public thoroughfare lying outside of the apparent base boundary, *i.e.*, the gate and

fence. I conclude, therefore, that the government failed to establish the requisite possessory interest to the land upon which the Appellant Joan McCoy was standing to maintain a section 1382 action.

Although it is possible that the U.S. Government does have a possessory interest in the land in question, the extent of that interest is entirely unclear.[5] Indeed, the location of the base boundary was the source of internal confusion among base personnel, resulting in the original line being moved to extend the military's asserted dominion. The evidence "suggested" that the Federal Government is the underlying lease holder to property in the vicinity of F–41, but the government failed to prove that the base boundary extended past its fenced perimeter. Consequently, the government failed to establish that the Appellant reentered a military reservation when she crossed a white line painted in a turning lane of a busy public highway.[6] I would therefore reverse Appellant's conviction.

## II.

In addition to an insufficient showing of proof by the prosecution as to an essential element of a section 1382 offense, I believe that a second source of grievous error existed in the trial court proceedings. The

---

4. Regarding all of the government documents and in particular exhibit 12, which purportedly restricted the easement granted the state for the construction of the highway, Judge Churchill stated, "the government frankly did not do a real good job of establishing the documentary history with respect to these documents."

5. Russell Small, the director of surveys for the Iosco County Road Commission, was the only expert witness to testify. When asked who owned the F–41 land, Russell Small replied, "We [the county] do not own it," and that "Honestly, I do not know...." Consequently, ownership of the land upon which F–41 was constructed was never conclusively established. In addition, Mr. Small's testimony did nothing to clear up the confusion as to why two easements were granted at different times for the construction of F–41 by two different parties. Judge Churchill asked a very appropriate question that was never satisfactorily resolved in the course of the trial when he asked Mr. Small, "as a surveyor, how do you reconcile the fact that the Conserva-

tion Department was giving the State of Michigan a right-of-way, and apparently the government, Federal Government, was giving the state of Michigan the right-of-way over the same land?" Mr. Small responded, "at the time that the Conservation Department issued to the State Highway Department this highway easement release, [exhibit 16] they must have been in control. Otherwise, they could not have issued it." Small concluded that he could not reconcile the two easements without further research.

6. The majority relies on *Loud v. Brooks*, 241 Mich. 452, 217 N.W. 34 (1928) for the proposition that a conveyance of land abutting a street generally carries with it the fee to the center of the street. However, it is also recognized that before this doctrine can be applied, proof is required that "the property must actually abut a street, alley, or highway." *Dickens v. Gordon*, 61 Mich.App. 353, 232 N.W.2d 707, 709 (1975). As this opinion indicates, I believe that the government has failed to prove that it has a property interest in the land abutting F–41.

district court summarily concluded that the defendants, including the Appellant, were not entitled to a jury trial.[7] Appellant, acting without the benefit of counsel at trial, inquired, "What is the reason for no jury?" The Court replied:

> Because Congress has said so, and the line has been drawn. There's a constitutional right to a jury under certain circumstances—not under certain circumstances. This is one of the certain circumstances where you do not have that right. I'm not necessarily saying it should be that way, but as far as I'm concerned, that's the way the statutes have been written and the law has been written on petty offenses.

Contrary to the district court's assertion, in my opinion, the Appellant's circumstances mandated the option of a jury trial if the Appellant so desired.

Article III of the Constitution mandates that "The trial of all Crimes ... shall be by Jury...." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly requires that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." U.S. Const. amend VI. In spite of this explicit language, the Supreme Court has accorded constitutional stature to the common-law rule that "petty" offenses may be tried without a jury. *See, e.g., Bloom v. Illinois*, 391 U.S. 194, 210, 88 S.Ct. 1477, 1486–87, 20 L.Ed.2d 522 (1968); *Duncan v. Louisiana*, 391 U.S. 145, 160, 88 S.Ct. 1444, 1453, 20 L.Ed.2d 491 (1968). Petty offenses are statutorily defined in 18 U.S.C.

§ 1(3) as "any misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both...." *See, e.g., United States v. Bishop*, 261 F.Supp. 969, 972 (N.D.Cal.1966) (single violation of 18 U.S.C. § 1382 was a "petty" offense not requiring a jury trial). However, defendants accused of "serious" crimes are afforded the right to a trial by jury, and an offense carrying a maximum penalty in excess of six months imprisonment is considered sufficiently severe to be automatically categorized as "serious." *Baldwin v. New York*, 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437 (1970) (plurality opinion).

"An offense is not 'serious' because it is severely punished; it is severely punished because it is 'serious.' The severity of prescribed sanctions is regarded as the best objective indication of the general normative judgment of the seriousness of an offense." *United States v. Craner*, 652 F.2d 23, 24 (9th Cir.1981) (citing *Baldwin*, 399 U.S. at 68, 90 S.Ct. at 1888). It is the maximum authorized penalty that will reflect the legislative judgment as to the "seriousness" of the offense. *See United States v. Stewart*, 568 F.2d 501, 503 (6th Cir.1978); *United States v. O'Connor*, 660 F.Supp. 955, 956 (N.D.Ga.1987). In determining if the Appellant's conviction was of an offense "serious" enough to implicate her right to a jury trial, the court should look at the maximum authorized penalty, rather than the actual penalty that has been or is likely to be imposed.[8] *See, e.g.,*

---

7. Although Appellant's counsel neglected to raise the issue of Appellant's right to a jury trial on appeal, under limited circumstances, Fed.R. Crim.P. 52(b) authorizes federal appellate courts to examine a critical issue not raised on appeal. Rule 52(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." As noted by the Supreme Court:

> In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.

*United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); *see Silber v.*

*United States*, 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962); *United Brotherhood of Carpenters & Joiners v. United States*, 330 U.S. 395, 412, 67 S.Ct. 775, 784, 91 L.Ed. 973 (1947); *United States v. Brown*, 508 F.2d 427, 430 (8th Cir.1974). Since I believe that Appellant's right to a jury trial was erroneously denied by the trial judge, this Court of its own motion should examine that deprivation of this constitutional right.

8. In *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), the Supreme Court stressed that the maximum *authorized* penalty was an objective criterion of the gravity of an offense. *Id.* at 161–62, 88 S.Ct. at 1453–54. In cases involving criminal contempts, the Court has looked to the punishment actually imposed

*Craner*, 652 F.2d at 24–25; *O'Connor*, 660 F.Supp. at 956.

The maximum punishment for violating 18 U.S.C. § 1382 is a $500 fine or six months in prison or both. But, as the district court made explicitly clear to the defendants including the Appellant, "but you understand there is a potential when you're charged with three offenses ..., there is the potential for consecutive sentences?" The judge continued by stating that, "We're dealing with offenses that if, upon convictions, can result in some rather significant prison sentences, rather long prison sentences. If a person is charged with three offenses or four, if they are charged with four, they would be facing a possibility of two years in prison." The Appellant was charged and sentenced on three counts of violating 18 U.S.C. § 1382. Consequently, she was subject to a maximum penalty of 18 months in prison and a $1500 fine. Because she faced a potential punishment of incarceration for over six months as well as fines in excess of $500, the Appellant was entitled to the jury trial that the district court summarily rejected.

Since, as the district court warned, the Appellant faced a potential penalty of 18 months imprisonment as well as a $1500 fine, and no limitation as to the charges was made by the government in advance of trial to obviate the necessity of a jury trial, the Appellant should have enjoyed her constitutional right unless she knowingly and voluntarily waived that right.[9] Given the

Appellant's inquiry "What is the reason for no jury?", which I construe as an objection, and the court's summary rejection of any right to a jury trial, the record does not support a finding of waiver. Accordingly, I conclude that the Appellant's constitutional right to a jury trial pursuant to Article III and the Sixth Amendment has been violated.

### III.

In my view, Appellant's conviction was based on insufficient proof and was obtained in derogation of her constitutional right to a jury trial. For these reasons, her conviction pursuant to 18 U.S.C. § 1382 should be overturned. I respectfully dissent.

---

to determine the defendants' rights to jury trials. *See Muniz v. Hoffman*, 422 U.S. 454, 476–77, 95 S.Ct. 2178, 2190–91, 45 L.Ed.2d 319 (1975); *Codispoti v. Pennsylvania*, 418 U.S. 506, 511, 94 S.Ct. 2687, 2691, 41 L.Ed.2d 912 (1974); *Taylor v. Hayes*, 418 U.S. 488, 496, 94 S.Ct. 2697, 2702, 41 L.Ed.2d 897 (1974). However, the importance of this objective criterion of actual punishment is limited to the criminal contempt context since criminal contempt is an offense "sui generis" that is "not a crime of the sort that requires the right to jury trial regardless of the penalty involved." *United States v. Craner*, 652 F.2d 23, 24 (9th Cir.1981) (quoting *Bloom*, 391 U.S. at 211, 88 S.Ct. at 1459).

For these reasons I am not persuaded by the majority citation to *Taylor v. Hayes, supra* note 3, a criminal contempt case that did not purport to decide the jury trial question at issue here. Although the language quoted from *United States v. Smyer*, 596 F.2d 939, 942 (10th Cir.

1979), more closely supports the majority's position, I find it unimpressive for two reasons. First, it is dictum; the defendants in *Smyer* had executed written waivers of their right to a jury trial that the appellate court explicitly found valid, thus rendering unnecessary any discussion of the scope of the defendants' rights. Moreover, the *Smyer* court's gratuitous analysis of the jury trial question relied strictly on Supreme Court cases handed down in the criminal contempt context. *See id.* In my view, this precedent does not justify the denial of Appellant's constitutional right to a jury trial.

9. Fed.R.Crim.P. 23(a) provides:

Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government.