**UNITED STATES of America, Appellee,**

v.

**Helen M. LaVALLEY; Jacqueline Hudson; John S. Ecclestone, II; Peter C. Dougherty; Luella C. Bassett; Elizabeth LaForest; and Kim Leith, Appellants.**

Nos. 91–1119, 91–1120 and 91–1123 to 91–1127.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 5, 1991.

Decided Feb. 24, 1992.

Rehearing En Banc Denied May 1, 1992.

---

James A. Brunson, Asst. U.S. Atty. (argued), and Stephen J. Markman, U.S. Atty. (briefed) Bay City, Mich., *for appellee United States.*

Kary Love (argued), Holland, Mich., *for appellants Helen M. LaValley and Jacqueline M. Hudson.*

Jeffrey J. Ellison (argued), and Gregory, Moore, Jeakle & Heinen, Ellison & Brooks (briefed), Detroit, Mich., *for appellants John S. Ecclestone, II, Luella C. Bassett, Elizabeth H. LaForest and Kim E. Leith.*

Dorean M. Koenig (argued), Lansing, Mich., and Zolton Ferency and Anabel Dwyer (briefed), East Lansing, Mich., *for appellant Peter C. Dougherty.*

Before KEITH, RYAN, and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge.

Appellants John Ecclestone II, Luella Bassett, Kim Leith, Helen LaValley, Jacqueline Hudson, Peter Dougherty, and Elizabeth LaForest appeal from a judgment entered December 11, 1990, after a bench trial, in the Eastern District of Michigan, Robert H. Cleland, *District Judge,* upon a

* The Honorable William H. Timbers, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, sitting by designation.

verdict of guilty on the charge of wrongfully entering a military base in violation of 18 U.S.C. § 1382 (1988).

On January 17, 1991, Judge Cleland sentenced Ecclestone to 12 months probation and a $2,000 fine; Bassett to 60 days imprisonment and a $1,000 fine; LaForest to 21 days imprisonment and a $1,000 fine; Leith to 12 months probation and a $2,000 fine; LaValley to 12 months probation and a $2,000 fine; Hudson to 60 days imprisonment and a $1,000 fine; and Dougherty to 60 days imprisonment and a $1,000 fine.

Appellants have appealed their convictions. Execution of their sentences has been stayed pending appeal.

Appellants assert several claims of error, including, among others, the following: (1) LaValley, Hudson and Ecclestone contend that they were improperly denied a jury trial; (2) Dougherty contends that he was barred improperly from entering the base; (3) Ecclestone, Bassett, LaForest and Leith contend that they did not reenter the base as alleged by the government; (4) Ecclestone, Bassett, LaForest, and Leith contend that the district court erred in allowing the government to introduce certain evidence in violation of the hearsay rule; and (5) Dougherty contends that his first amendment rights were violated by the military's "selectively targeting political or protest demonstrations" in an area open to the public.

Furthermore, Ecclestone, Bassett, LaForest and Leith contend that they were denied fundamental fairness and due process because they were told by the military that $500 was the maximum fine and the actual fines imposed exceeded that amount.

Moreover, Dougherty contends that, since he received a bar letter in 1983 and was convicted in 1987 of unlawful re-entry onto Wurtsmith Air Force Base (WAFB), the double jeopardy clause bars his prosecution; and that his Fourth, Fifth and Sixth Amendment rights were violated when he was detained for four hours, fingerprinted, and questioned regarding his date of birth, driver's license and address.

For the reasons that follow, we affirm the convictions of all appellants.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.

WAFB is a federal military installation located in Iosco County, Michigan. The federal government has granted Iosco County a one hundred fifty foot easement for the construction, maintenance and use of county highway F–41 which runs adjacent to WAFB. In addition to covering the roadway, the easement extends to cover approximately sixty feet on each side of F–41. On the base side of the highway, the easement includes a grass strip located between the "white line" marking the edge of the roadway, and a permanent chain link fence. Appellants assert that this strip is used frequently by pedestrians, joggers, and snowmobilers in the winter months.

On August 4, 1990, an orange snow fence, approximately three to four feet high, was placed along the white line marking the entrance to the base. The fence extended along the white line adjacent to F–41 for some distance until it ended running perpendicular to the road, across the grassy strip, and joining the permanent steel chain link fence. Pedestrian traffic was blocked on the grassy strip adjacent to WAFB at the point where the snow fence intersected the permanent steel fence. Senior Master Sergeant Brian Clever testified that appellants, along with a group of approximately four hundred other protestors, marched down the grassy strip toward the base entrance until they encountered the orange snow fence. Warning signs were mounted on the snow fence roughly every twenty feet, stating: "It is unlawful to enter this area without permission of the installation commander." On August 4, 1990, protestors pushed down the snow fence and about one third of them entered the restricted portion of WAFB. At this time, Sergeant Clever read the following prepared statement to appellants, ordering them to leave the base:

"You are on a United States military reservation at Wurtsmith Air Force Base, Michigan.

Specific permission of the installation commander is required for entry onto Wurtsmith Air Force Base and that permission has not been granted.

The installation commander has determined that any political or protest demonstration taking place within the boundaries of Wurtsmith Air Force Base could interfere with the mission of the 379th Bombardment Wing.

By order of the installation commander, Wurtsmith Air Force Base, you are hereby ordered to leave Wurtsmith Air Force Base.

Your continued presence in Wurtsmith Air Force Base will place you in violation of the lawful order to leave and you will also be in violation of lawful regulations prohibiting your entry onto Wurtsmith Air Force Base.

Your continued presence on Wurtsmith Air Force Base may render you criminally liable for violation of federal law.

You are again ordered to depart Wurtsmith Air Force Base immediately."

Since appellants failed to leave after receiving these warnings, they were detained for wrongful entry onto a military base in violation of § 1382. Air Force personnel recorded these events on video tape and presented the tapes as evidence at appellants' trial.

The district court found that appellants previously had entered WAFB and had received letters from the base commander barring them from future entry. These findings were based on testimony by Sergeant William Stern, a noncommissioned officer in charge of the Security Police Reports and Analysis Section, that letters barring from the base all appellants were prepared and maintained in the ordinary course of business. The court found that these letters established that appellants previously had wrongfully entered the base and had been barred from future entry by the base commander. These documents were admitted pursuant to the business records exception to the hearsay rule. Fed.R.Evid. 803(6).

In rendering his decision, Judge Cleland made two additional pertinent findings.

He found that "the area in question in this case had not been converted into any form of a public forum for the dissertation of political or religious or any other kind of protected speech", and that the First Amendment is not "implicated in any way in this case."

## II.

 We turn first to the contentions of LaValley, Hudson and Ecclestone that they were entitled to a trial by jury because a violation of § 1382 is a "serious" rather than "petty" offense. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...." U.S. Const. amend. VI. The Supreme Court, however, has not pursued a literal interpretation of this language, carving out an exception to the rule for "petty offenses". *E.g., Blanton v. North Las Vegas*, 489 U.S. 538, 541 (1989). A "petty offense" is one in which the defendant would be subject to no more than a six month period of incarceration. *Id.* at 542–53 In cases where the maximum sentence cannot exceed six months, "[a] defendant is entitled to a jury trial in such circumstances *only* if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they *clearly reflect a legislative determination that the offense in question is a 'serious' one." Id.* at 543 (emphasis added). Such situations, however, are rare. *Id.* Since the maximum statutory punishment for violations of § 1382 is only a six month period of incarceration, a fine of $5,000 and a five year term of supervised release, the offense is "petty" within the meaning of *Blanton.* Appellants accordingly are not entitled to trial by jury. *United States v. Floyd*, 477 F.2d 217, 222 (10th Cir.), *cert. denied*, 414 U.S. 1044 (1973) ("The violation of [s]ection 1382 ... constitutes a petty offense not requiring a trial by jury.").

 Ecclestone asserts an additional challenge to the district court's denial of a

jury trial. Ecclestone is licensed to practice law in the State of Michigan. His license may be revoked by the Michigan Supreme Court for violations of the laws of the United States. *Cf. United States v. Craner*, 652 F.2d 23, 26 (9th Cir.1981) ("the threat of loss of a license as important as a driver's license ... is another sign that the DUI defendant's community does not view DUI as a petty offense"). We reject Ecclestone's contention that this additional factor made his violation of § 1382 a "serious" offense. His contention is without merit because the revocation of his bar license is not statutory and because the revocation of his license would not directly follow a conviction under § 1382. Michigan Court Rules § 9.110–12 (providing for a full hearing before a review board prior to the revocation of an attorney's license). Moreover, Ecclestone's assertion, pursued to its logical conclusion, would mean that lawyers have a special right to jury trials because their licenses arguably may be revoked for any infraction of the law. We decline the invitation to create such an exception to *Blanton.*

### III.

This brings us to the merits of appellants' contentions that their conduct was not prohibited by § 1382. Ecclestone, Bassett, LaForest, Leith and Dougherty contend that the prosecution of them was wrongful because the evidence is insufficient to support a conviction under § 1382 which provides in relevant part:

> "Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof ... [s]hall be fined not more than $500 or imprisoned not more than six months, or both."

The Alternative Fine Act, 18 U.S.C. § 3571 (1988), raises the ceiling on the maximum fine for infractions of § 1382 from $500 to $5,000. Appellants contend that two of the prerequisites of § 1382 have not been satisfied. Ecclestone, Bassett, LaForest and Leith argued that they did not wrongfully

re-enter the base. Dougherty, on the other hand, contends that he was not barred previously from WAFB by the base commander.

### (A)

We first turn to the contention of Ecclestone, Bassett, LaForest and Leith that there was insufficient evidence to support their convictions because the federal government had granted Michigan an easement to use the land adjacent to highway F–41, and appellants therefore were lawfully on the grassy strip at the time they were taken into custody. We disagree.

In *United States v. McCoy*, 866 F.2d 826 (6th Cir.1989), we held that the grassy strip in question is part of WAFB. In *McCoy*, we addressed the issue as to whether the driveway at the main entrance to WAFB is part of the base for purposes of § 1382. In resolving that issue, we cited the district court's finding that "there isn't any question that the entire area up to at least the center of the road, if not beyond, is a part of the military base...." *Id.* at 831. The grassy strip on which the protestors were apprehended in the instant case was within the boundary that we already have determined to be part of the base. The mere fact that an easement had been granted to the state for the construction, maintenance and use of highway F–41 did not give the protestors the right, in bold defiance of military authority, to enter the base, after being previously barred.

A different question would be presented if appellants' only intrusion into the base was driving an automobile on F–41. *Id.* In *United States v. Albertini*, 472 U.S. 675 (1985) (Stevens, J., dissenting), a case where a defendant was convicted under § 1382 for re-entering Hickam Air Force Base, Hawaii, Justice Stevens stated that "highways or other public easements often bisect military reservations," and that:

> "If an individual who has been removed from Hickam is liable under § 1382 whenever he is thereafter 'found within' its boundaries, he risks criminal punishment every time he departs on an airline flight that may use the runway travers-

ing the base. The use of these military lands for the limited public purposes for which they have been set aside does not involve the bold defiance of authority that is foreseen by the structure of the statute and reflected in its legislative history."

*Id.* at 698–99

Unlike Justice Stevens' hypothetical person innocently traversing a highway or crossing a military runway, appellants in the instant case boldly defied military orders. They crossed over a snow fence on which warning signs were posted. They remained on the base even after they were ordered to leave by the base authorities.

For these reasons we hold that the district court's conclusion that appellants had re-entered WAFB unlawfully was not erroneous.

### (B)

◼ We turn next to Dougherty's contention that there was insufficient evidence to support his conviction because the bar orders were improperly issued. Specifically, Dougherty contends that the orders were invalid because they were not prepared by the base commander and he had not been barred previously from the base within the meaning of § 1382. In making this contention, Dougherty points to the "fill-in-the-blanks" nature of the bar letters. We are not persuaded.

The district court held that, although the bar letters were pre-signed by the base commander, they were issued only after the commander had given his authorization on a case-by-case basis. Contrary to Dougherty's contention, there is no requirement that the base commander perform the administrative task of "filling-in-the-blanks" in the bar letters. There is no basis for concluding that the district court's holding that the bar letters were properly issued was erroneous.

### IV.

◼ We now turn to the contention of Ecclestone, Bassett, LaForest, and Leith that the district court improperly admitted

the bar letters pursuant to the business records exception to the hearsay rule because the letters were prepared for the purpose of litigation. We find no merit in this contention.

The district court stated: "The testimony, the Court is satisfied, does establish that the records were kept in a regular fashion, that they were part of a regular activity of the enterprise and the provisions of 803(6), I think are sufficient." Although "conclusions of law, such as whether proffered evidence constitutes hearsay within the meaning of Federal Rules of Evidence, are reviewed de novo," *United States v. Levy,* 904 F.2d 1026, 1029 (6th Cir.1990), *cert. denied,* 111 S.Ct. 974 (1991), the issues to be resolved in the instant case do not involve either questions of law or the application of the law to factual determinations. Rather, the district court simply made factual findings that the bar letters were not prepared for purposes of litigation. Since we will not set aside a district court's findings of fact unless clearly erroneous, *Whitney v. Brown,* 882 F.2d 1068, 1071 (6th Cir.1989), and since we hold that the court's factual findings were not erroneous, we reject appellants' contention that the bar letters were improperly admitted.

### V.

◼ Finally, we consider the contention of appellant Dougherty that his First Amendment rights were violated by the government's "selectively targeting political or protest demonstrations" in an area open to the public. This argument is without merit. Military bases are not public forums. *Greer v. Spock,* 424 U.S. 828, 838 (1975) ("The notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is thus historically and constitutionally false."); *McCoy, supra,* 866 F.2d at 832–34. Because we have already held that the grassy strip where appellants were apprehended was part of WAFB, Dougherty's claim must necessarily fail. Furthermore, even if the area in question is a public forum,

appellant's claim still fails. In *Albertini, supra,* 472 U.S. at 688 the Court found that § 1382 is content-neutral, and "[t]he First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests." We find that appellant's speech was at most only incidentally burdened. The bar letters only forbid his entrance onto the WAFB, appellant was still free to protest outside of the base.

## VI.

To summarize:

We hold that appellants' convictions should be affirmed. First, since we hold that a violation of § 1382 is not a "serious" offense for Sixth Amendment purposes, the district court did not err in denying appellants a jury trial. Second, there is no basis for concluding that there was insufficient evidence to support appellants' convictions. Despite the lawful issuance of letters barring appellants from WAFB, appellants boldly defied military authorities. Third, there is no support for appellants' claim that the district court was clearly erroneous in admitting the bar letters pursuant to the business records exception to the hearsay rule. Finally, the military's prohibition on appellants entering WAFB did not violate the First Amendment. We find no merit in any of appellants' claims of error.

Affirmed.

RYAN, Circuit Judge, dissenting.

In my judgment, the government failed to prove that the defendants violated 18 U.S.C. § 1382 because they were not shown to have reentered the Wurtsmith Air Force Base. The evidence in this case demonstrated that the grassy strip on which the defendants were walking is not part of the air base but is within an easement for public use which has been granted to the state of Michigan in connection with the use of Highway F–41.

Part of a proper analysis to determine whether the defendants had reentered the Wurtsmith Air Force Base is to identify what is not involved in this case. What is not involved is any question whether the defendants improperly interfered with the lawful order of military authorities in connection with any national or public emergency, or the lawful exercise of the police powers of the federal government. The only issue relating to the sufficiency of the evidence is whether the defendants violated section 1382 by reentering the Wurtsmith Air Force Base.

### I.

In part III.(A), the majority opinion considers whether the federal government granted Michigan an easement to use the land adjacent to Highway F–41 for highway purposes and, if so, whether that land is, nevertheless, part of Wurtsmith Air Force Base. Acknowledging that such an easement exists, the opinion concludes: "The mere fact that an easement had been granted to the state for the construction, maintenance and use of Highway F–41 did not give the protestors the right, in bold defiance of military authority, to enter the base, after being previously barred." Respectfully, it seems to me that that conclusion merely begs the question whether the easement is part of the air base. Rather than analyzing that question, the majority opinion merely declares that the issue has been decided: "In *United States v. McCoy,* 866 F.2d 826 (6th Cir.1989), we held that the grassy strip in question is part of WAFB."

The majority opinion then quotes a portion of *McCoy* in which this court merely quoted a statement by the district court in that case that "the entire area up to at least the center of the road" is part of Wurtsmith Air Force Base.

In my view, the majority's reliance upon *McCoy* is misplaced and, as a result, its conclusion that *McCoy* decides this case is mistaken.

*McCoy* did not address the nature of the Air Force's property interest in the land between the permanent chain link fence and the paved portion of F–41. Rather, *McCoy* focused only upon the driveway

leading from F–41 into the base, and this court affirmed the district court on two points: (1) The *McCoy* court agreed with the district court's conclusion that the driveway was part of the base, holding that "we are certainly in no position to quarrel with Judge Churchill's findings that the *driveway area* was 'within control of the military' and that '[a]nybody has to have their head in the sand not to see it....' " *Id.* at 832 (emphasis added). (2) The *McCoy* court held that the defendant in that case, Joan McCoy, was not using the driveway area for its proper public purpose. In explaining its decision, the *McCoy* court noted:

> But the authorities at Wurtsmith Air Force Base made no attempt to prevent Mrs. McCoy from using the southbound traffic lane of Highway F–41 for the limited public purpose for which it had been set aside.... The *driveway area* to the west of the boundary line had not been set aside as a public forum, and Mrs. McCoy's insistence on crossing the line to use the *driveway* for that purpose involved precisely the sort of "bold defiance of authority" that was missing in Justice Stevens' hypothetical airline passenger case.

*McCoy*, 866 F.2d at 831 (quoting *United States v. Albertini*, 472 U.S. 675, 699, 105 S.Ct. 2897, 2911–12, 86 L.Ed.2d 536 (Stevens, J., dissenting) (1985)) (emphasis added). Nowhere in *McCoy* did the court hold "that the grassy strip in question is part of Wurtsmith Air Force Base."

## II.

The decisive issue in this case is whether the defendants, when they were arrested on August 4, 1990, had "reenter[ed] or [were] found within the limits of the United States military reservation at Wurtsmith Air Force Base, Michigan" as prohibited by the bar letters previously issued to them. When arrested, the defendants were not on the driveway leading into Wurtsmith, as in *McCoy*, but rather were on the grassy strip of land between the permanent chain link fence that marks off the boundary of the base and the edge of the pavement of F–41. It appears to me, based upon the doc-

uments in evidence in this case, the finding of the trial court, and the applicable Michigan statute, that, as a matter of law, the grassy strip in question is not a part of Wurtsmith.

## A.

It is indisputable that the federal government has a property interest of some sort in the land on which F–41 sits. The nature and extent of that interest are somewhat unclear. Nevertheless, the documents admitted into evidence in the trial below demonstrated that the state possesses an easement 150 feet wide for highway purposes.

Exhibit 22, referred to during trial as Document D, establishes that the federal government granted the state of Michigan an easement for highway purposes. Exhibit 22 is a Permit for Extension of Road Across Military Reservation from the Secretary of War to the State of Michigan, dated June 21, 1946. It grants to the state "permission to extend a road across the Oscoda Army Air Field, Oscoda, Michigan, which road is designated as Michigan State Highway M–171, said road being, in general, along the Northeasterly boundary of the Oscoda Army Air Field...." Paragraph 6 of this document reads:

> The United States reserves the right to make such connections between the road herein authorized and the roads and streets on said military reservation as the chief of engineers may from time to time consider necessary, and also reserve to its rights of way for all purposes across, over and/or under the right of way hereby granted; provided, however, that such rights shall be used in a manner that will not create unnecessary interference with the use and enjoyment by the grantee of said rights of way or for highway purposes.

Although this document establishes the fact of the right of way, it does not specify its width.

An earlier document described the width of the easement. Exhibit 21, referred to as Document C, is a Highway Easement Release from the Michigan Department of

Conservation to the State of Michigan dated February 12, 1943. It conveyed to the state "an easement for highway purposes [ ] in ... [a] strip of land 150 feet in width lying 75 feet each side of and adjacent to the center line of M–171 as now surveyed over and across the [described land tracts in] (Oscoda Township, Iosco County), Michigan." The Air Force's property record witness, Captain Reed, testified that M–171 is essentially the present day F–41. Based on this document, the parties entered into, and the district court accepted, a stipulation that the easement was 150 feet wide.[1]

Evidence adduced at trial demonstrated that the public has continuously used the right of way. Testimony from Air Force personnel indicated that joggers and disabled cars regularly use the shoulder of F–41 at will.

Despite the legal existence of the easement and its continuous use by the public, the base commander unilaterally occupied the easement on August 4, 1990 by erecting a temporary snow fence extending from the chain link fence to the edge of the pavement of F–41. In doing so, the base commander undertook to extend the limits of the base beyond the permanent boundary as established by the chain link fence and in disregard of the long-standing use of the land as part of the public way. The district court held that the base commander's action was appropriate, noting: "I find that the Air Force Base Commander has a right to control all of the property to the edge of the roadway." The majority opinion affirms this holding.

In reaching its conclusion, the majority opinion ignores both the documentary evidence adduced at trial and controlling property law as established in the state of Michigan. The permit granting Michigan the right to build and maintain F–41 stated that the rights retained by the United States "shall be used in a manner that will not create unnecessary interference with the use and enjoyment by the grantee of said rights of way or for highway purposes." The base commander's order to erect a fence, preventing pedestrians from traversing the grassy strip that was long ago set aside for public use and forcing them to walk on the paved portion of F–41, interfered with the use of the public easement.

Further, the base commander lacked the right to reoccupy the grassy strip. Michigan statutes establish that once given, a right of way for highway purposes may not be encroached:

> All public highways for which the right of way has at any time been dedicated, given or purchased, shall be and remain a highway of the width so dedicated, given, or purchased, and no encroachments by fences, buildings or otherwise which may have been made since the purchase, dedication or gift ... shall give the party or parties, firm or corporation so encroaching, any title or right to the land so encroached upon.

Mich.Comp. Laws Ann. § 247.189 (West 1990). Michigan courts have held that the state retains the entire easement even if it only uses a portion of it for the actual paved portion of the highway:

> [I]t is not necessary that every portion of a highway be traveled upon in order to show the intention of the public authorities to accept the entire highway dedication.
>
> . . . .

> THE COURT: What's the need for the document then?
>
> MR. ELLISON: I just want to show the easement is 150 feet wide, your Honor.
>
> THE COURT: Do you have any doubt about that, Mr. Brunson?
>
> MR. BRUNSON: That's what the document says.
>
> THE COURT: *Why don't you take that as proven, let's move along here.*
>
> (Emphasis added.)

---

**1.** The following exchange occurred at trial regarding the width of the easement:

> THE COURT: Is there any doubt that the military—either the Army or the Air Force—at one time or another granted easements for the purpose of construction and maintaining this highway?
>
> MR. ELLISON: I believe the government has just stipulated to it with my proposed stipulation of the facts from the McCoy case.
>
> MR. BRUNSON: No, there's not a significant problem with that.

**1318**

[T]he state's use and acceptance of the dedication prevented acquisition of the unused portion by subsequent encroachments of the parties.

*Miller v. State Highway Dept.,* 30 Mich. App. 64, 70–71, 186 N.W.2d 67 (1971).

The land records in evidence in this case relating to F–41, specifically Exhibits 21 and 22, the findings of the trial court, *see supra* n. 1, and M.C.L. 247.189, establish that a 150–foot easement existed for public use in connection with F–41. Specifically applied to the facts of this case, the easement thus extends 75 feet west from the center line of F–41. This 75–foot easement includes all of the paved portion of F–41 and its shoulder, and also includes much if not all of the grassy strip between the road and the chain link fence enclosing the air base. When the base commander ordered the temporary fence erected, he unilaterally reclaimed a portion of the easement which he was not free to occupy absent permission from the easement holder, the state of Michigan, or, conceivably, exigent circumstances not claimed to exist.

### III.

The defendants did not violate 18 U.S.C. § 1382 because they did not reenter Wurtsmith.

Once an easement is given, the grantor of the easement may not, as a general rule, interfere with the use of that easement. The permanent chain link fence running parallel to F–41 is the demarcation of the limits of Wurtsmith, and the base commander did not have the right to attempt to expand the limits of the base by unilaterally erecting the temporary fence upon the public easement. The defendants did not violate the bar letter when walking in the grassy strip between F–41 and the chain link fence because the grassy strip where they were arrested is a public way and not part of the air base within the meaning of the bar letter.

For these reasons, I respectfully dissent.