**UNITED STATES of America, Plaintiff,**

v.

**Andrew ZUKOWSKI, Defendant.**

**No. CR–2–97–31.**

United States District Court,
S.D. Ohio,
Eastern Division.

June 6, 1997.

Kevin W. Kelley, Dept. of Justice, U.S. Attorney's Office, Columbus, OH, for U.S.

Michael Gunner, Michael Gunner Law Offices, Hilliard, OH, for Andrew G. Zukowski.

## OPINION AND ORDER

KEMP, United States Magistrate Judge.

Until December of 1996, Andrew Zukowski worked as an electrical engineer at the Defense Supply Center in Columbus, Ohio (the DSCC). On December 4, 1996, he was issued a notice of proposed removal, and was removed from federal service effective January 9, 1997. On both December 4, 1996 and January 10, 1997, Rear Admiral Elliott, the Commander of DSCC, sent Zukowski a letter barring him from returning to the DSCC, and advising him that if he did so, he could be prosecuted under 18 U.S.C. § 1382.

Exactly what happened on the morning of March 24, 1997, will be described in some detail below. For introductory purposes, it suffices to say that on date, sometime shortly before noon, Zukowski appeared either on or near the DSCC and was arrested by two police officers. He was then charged in an information filed on April 7, 1997 with violating 18 U.S.C. § 1382. He waived trial before a District Judge and the matter was tried to the undersigned, sitting without a jury, on May 12, 1997. This Opinion and Order explains why Zukowski's guilt was not proved beyond a reasonable doubt.

## I. FACTS

Most of what happened before, and, even on, March 24, 1997 is not disputed. On December 4, 1996, Zukowski received a notice that his removal from employment was being recommended. Apparently, he was thought to have exhibited discourteous and intimidating behavior toward customers and co-workers and contemptuous behavior toward "constituted authority." It would appear that Admiral Elliott chose to bar Zukowski from the DSCC for similar considerations; his December 4, 1996 letter (Govt.Ex. 1) telling Zukowski not to return to the DSCC refers to Zukowski's "history of disruptive behavior, uncontrolled temper, and intimidating conduct. . . ."

It seems that the proposed removal became a final removal on January 9, 1997. A day later, Admiral Elliott wrote a second bar letter. That letter (Govt.Ex. 2) repeated some information from the earlier bar letter, but also said that the termination of Zukowski's employment was an additional reason that he could not come back to the DSCC. The letter was not absolute; it told Zukowski that, if he needed to, he could come back on the base to conduct legitimate business. To do that, he had to obtain permission from the DSCC police chief at least 24 hours in advance of each visit. He was also told that he would be escorted by a police officer and subject to a search each time he came back.

Zukowski does not think that his removal from federal service was proper. He appealed it to the Merit Systems Protection Board, and filed an EEO complaint (he is apparently Polish). On March 19, 1997, he was allowed to come to the DSCC for an EEO hearing. Two other times, he went as far as the main gate of the DSCC, which is located at 3990–3992 East Broad Street, and delivered letters for the base Commander. It does not seem that anyone told him on those occasions he should not be coming to the gatehouse to deliver letters.

Something untoward apparently happened at the EEO hearing on March 19, 1997, because Zukowski claims he was injured there. Even though he was no longer working at the DSCC, Zukowski decided to file a workers' compensation claim for his injury.

He called the DSCC on March 21, 1997 and again on March 24, 1997 to try to obtain a form for doing so. On March 24th, early in the morning he spoke with Don Smith, an attorney at the base, about the form. Mr. Smith had been delegated the duty of taking Zukowski's calls. Zukowski asked if he could come out to the base that day to pick up the form. Smith emphatically told him not to, but he thought that Zukowski might still come out, so he called the base police and told them to be on the lookout for Zukowski later that morning.

After speaking with Smith and getting no satisfaction, Zukowski composed a letter to the base Commander. He then drove out to the Federal Credit Union, which is located immediately to the east of the driveway leading to the DSCC gatehouse, parked his car, and approached the gate. That is when the arrest occurred. Because the location of the arrest is fairly important, the Court will describe in some detail the physical layout of the entrance to the DSCC. The pictures that the parties introduced are much better evidence of this layout, but the Court will do its best to provide an accurate and understandable verbal description.

The DSCC lies to the north of East Broad Street. At that location, Broad Street passes through Whitehall, a suburb of Columbus. There is a paved driveway leading north from Broad Street to a guardhouse which sits between two metal gates. The gates, when closed, become part of a fence system which runs behind the Credit Union and encloses the DSCC.

If someone wants to enter the base through this gate, he or she would, if traveling west on Broad Street, make a right-hand turn into a four-lane driveway. The two northbound and two southbound lanes of the driveway are separated by a median. There is a sign at the entrance to the driveway which says "DSCC" in large letters, along with the street number ("3990/3992"). There are no gates, fences, or ropes at that end of the driveway, and no warning signs about entering federal property. The driveway interrupts the public sidewalk along Broad Street, and most pedestrians using the sidewalk would probably cross the driveway rather than walking out into the street. The photograph that is Govt. Ex. 7 illustrates this area well.

If one approaches the gatehouse, some more signs located just south of the barrier fence can be seen. Those signs contain the name of the base, describe "Major Tenant Activities," and provide some warnings. Govt. Ex. 10 is a good picture of them. One warning sign advises the approaching driver or pedestrian, in fairly small print, that "it is unlawful to enter this installation without the permission of the activity Commander" and that "while in this installation, all personnel and property under their control are subject to search." The other sign says, in slightly bolder type, that no firearms or dangerous weapons are permitted on the installation, and warns that violators will be prosecuted and their firearms will be confiscated. It would be very hard to read either of these signs from Broad Street; certainly, someone would have to go almost to the end of the driveway, almost up to the gate, to make out what they say. There is also a stop sign near the gate which has some smaller signs beneath it. These signs are actually set back from the gate, perhaps ten yards, and one would have to pass through the gates to reach the signs.

The median that separates each side of the driveway strip does not continue uninterrupted up to the guardhouse. There is a gap between a shrubbery island and the guardhouse which would let someone make a U-turn and go back to East Broad Street. There are no signs which would tell someone who did so that he or she would need to stop or to subject himself or herself to questioning or to a search.

Returning now to the events of March 24, after Zukowski drove to the Federal Credit Union and parked in its parking lot, he walked westward toward the driveway. There is some landscaping between the credit union parking lot and the driveway, but near the northern end of the driveway, about ten yards south of the fence and the gate, the landscaping gives way to a paved walkway. This walkway can be seen clearly on Defendant's Ex. 4. There is no physical barrier nor any warning signs either along the walk-

way or at the edge of the driveway. Zukowski walked along this walkway and, after reaching the DSCC driveway, then angled north toward the guardhouse.

The guards, who by this time had spotted Zukowski coming, did not let him get as far as the guardhouse or even the gate. Rather, one of them, Officer McDoniel, approached Zukowski and told him that he was not permitted to be on the base. Zukowski did not directly respond, but, according to Officer McDoniel, took another step closer to the open gate while waving a letter above his head and stating loudly that it was for the Commander. By that time, the other officer, Ernest Jackson, had circled around behind Zukowski. He saw Zukowski pull something out of his jacket pocket. Jackson, taking no chances, immediately arrested Zukowski and handcuffed him. Zukowski was then taken to the guard shack and then later to somewhere else on the base, but the farthest he went on his own was to the spot where Jackson arrested him.

The accounts of where the arrest took place were pretty much the same. Two of the witnesses made marks on Govt. Ex. 4, a large-scale drawing of the driveway and some of the surrounding properties, and both marks are three to four feet (by scale) south of an imaginary line extended along the boundary fence, the gates, and the guardhouse, a spot one might typically describe as being "outside the gates." All of the eyewitnesses, including Zukowski, testified verbally that he hadn't gone through the gate, or even under the gate beam; everyone agreed he was still on the driveway and south of the gates. He had walked where he could see the warning signs, but he hadn't gone past them, at least not in the direction of the base. Whether he broke the law by going to the spot where he was arrested is the key issue in this case.

## II. LEGAL FRAMEWORK

The pertinent portion of 18 U.S.C. § 1382 reads as follows:

"Whoever reenters or is found within any [military, naval or Coast Guard] reservation, post, fort, arsenal, yard, station, or installation, after having been ... ordered not to reenter by any officer or person in command or charge thereof—

Shall be fined under this Title or imprisoned not more than six months, or both."

One of the elements of the crime defined by this part of § 1382 is the existence of an order not to reenter a military reservation, issued by the person in command. There is really no dispute that Rear Admiral Elliott was the person in command of the DSCC and that he authorized the two bar letters to be written and sent. Additionally, there is no question that the DSCC is a "military reservation." The Court finds that both of these elements were proved beyond a reasonable doubt. Thus, the only question is whether Mr. Zukowski is someone who either "reentered" or was "found within" the DSCC. Answering that question includes discussing a surprisingly complicated mix of factual and legal issues. It is probably more helpful to start with the legal background, and then to describe how the government's evidence fits within this framework.

Even though the penalties for violating § 1382 are not substantial, cases in which defendants have been convicted under that statute have made their way to a number of the Courts of Appeals and even to the United States Supreme Court. Several of the more interesting cases arose in the Sixth Circuit. Most of the cases involved protests at military installations. The best starting point for this discussion is *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985).

In 1972, James Albertini and a friend went to Hickam Air Force Base in Hawaii under the pretense of having a letter to present to the Commanding Officer of the base. Once there, they destroyed secret Air Force documents by pouring animal blood on them. Not surprisingly, Albertini was then barred from returning to Hickam Air Force Base without written permission. Nine years later, Hickam held an open house on Armed Services Day. A press release described the base as being "open to the public" on that day. Albertini and four of his friends accepted this public invitation to go to the base. While there, they gathered in front of a B–52

bomber display, unfurled a banner, and passed out leaflets. After he was escorted off the base, Albertini was charged with violating § 1382 by having reentered Hickam in contravention of the earlier bar letter, was convicted, and ultimately sought vindication in the Supreme Court.

In his appeal, Albertini did not question the physical boundaries of the base; the spot in front of the bomber was clearly within those boundaries. However, he did argue that he did not knowingly violate the law because he reasonably believed that when the base held a public open house, all members of the public, including someone who got a bar letter nine years earlier, were allowed to attend. Had that argument been accepted, this Court would be required to consider whether Zukowski reasonably believed that his bar letter did not cover the driveway. Unfortunately for Albertini, the Supreme Court rejected his claim that § 1382 is a specific intent crime, or that his subjective belief about the legality of his action had anything to do with his guilt or innocence. *U.S. v. Albertini*, 472 U.S. at 683, 105 S.Ct. at 2903–04. The Court also observed that statute applied not only to areas of military bases where access is usually restricted, but that it also applied all areas of military bases, even those generally open to the public. *Id.* at 682–83, 105 S.Ct. at 2903–04. As will be seen shortly, that latter observation has not been taken quite at face value, at least not in this Circuit.

The Sixth Circuit has published two decisions involving protestors who were arrested at the Wurtsmith Air Force Base located in Iosco County, Michigan. The first, *United States v. McCoy*, 866 F.2d 826 (6th Cir.1989), involved a defendant who had gotten a bar letter and who was passing out leaflets while standing either on or near a driveway leading from a public road to the base—a situation not too dissimilar from this case. The United States insisted that it held legal title to the driveway. As noted in the dissenting opinion, although the government attempted to prove its legal title by testimony and documents, the government's expert "did very little to clarify the boundaries of the base. She was obviously confused and ill-

equipped to give legal opinions as to the documents in her control," which included copies of leases and easements. *United States v. McCoy*, 866 F.2d at 835 (Celebrezze, J., dissenting). The documents themselves were not much more helpful, and apparently indicated that both the United States and the State of Michigan thought it owned the land, because each had granted an easement to the county to build a roadway.

The majority opinion in *McCoy* did not view this difficulty in proving legal title to be of much significance. Rather, the Court concluded that all that was needed to show that the defendant was on a military reservation was clear evidence that the government had some type of possessory interest in the property, and the proof could be as simple as evidence that the government was exercising some control over what happened there. In that case, precisely in order to attempt to define the boundary between the road and the base, the military authorities had directed that a white line be painted along the side of the roadway. Although the defendant apparently began her leafleting on the roadway side of the line, she admitted that she crossed the white line and stood on the base side after she had been warned that by doing so, she would be violating the bar order. She also refused to leave the area after she was told to. These facts, the Court felt, were enough to support the conviction, although the Court believed the outcome might have been different if the defendant had been using the public highway "for the limited public purpose for which it had been set aside" and even the United States held legal title to the highway. *Id.* at 831.

That last comment was made in response to an example used in Justice Stevens's dissent in *Albertini*. Justice Stevens had noted that a portion of the main runway of the Honolulu Airport was technically within the boundaries of Hickam Air Force Base, and wondered whether liability under the statute was so strict that a person using the public runway for the purpose permitted would nonetheless be subject to prosecution under the statute. The *McCoy* majority did not seem to think so, and had Ms. McCoy simply

been driving down the road, she probably could not have been convicted under § 1382.

The other Wurtsmith Air Force case is *United States v. LaValley*, 957 F.2d 1309 (6th Cir.), *cert. denied*, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 369 (1992). In *LaValley*, the same county road and adjacent property was at issue, except that in *LaValley* the defendant was arrested on a grass strip which ran between the road and the chain link fence surrounding the base. The strip was part of a 60–foot easement which had been granted to the county on either side of the highway. At the time the defendant was arrested, he was subject to a bar order, and he and a number of other protestors had pushed down a snow fence which had been erected by base authorities across the strip. Defendant and the other protestors all refused to leave the area after having been ordered to do so. Consistent with *McCoy*, the *LaValley* court affirmed the conviction, noting that although the area in question might have been part of an easement which had been granted to the county, there was clear evidence that the base continued to exercise possessory control over that portion of the grassy strip where the protestors were arrested.

Other courts have also expressed some uneasiness about the concept that using an obviously public area that, technically, lies within a military base can constitute a prohibited entry onto the base in violation of a bar order and support a § 1382 conviction. For example, in *United States v. Vasarajs*, 908 F.2d 443 (9th Cir.1990), the defendant was approaching a military base by way of an access road simply in order to drop some friends off at a dance. She had previously been barred from the base, and when she passed a sign stating that persons who entered the base were subject to search, she changed her mind about dropping her friends off and turned around to leave. However, she was stopped by base authorities and subsequently convicted of violating § 1382. In that case, there was no question that the government held legal title to the access road. The Court observed that once legal title had been established, some type of abandonment would have to be shown before

the property was not considered to be part of the reservation. Moreover, it thought that the warning signs on the access road were enough notice to the public that the base was exercising possessory control over the access road and that persons on the road had therefore entered the base and left the public domain. A similar issue came up in *United States v. Renkoski*, 644 F.Supp. 1065 (W.D.Mo.1986), where the defendant was arrested in a grassy area outside the installation fence. The grassy area was usually open to the public without restriction. On the day in question, the area had been cordoned off, and the protestors, who had graciously given the base advance notice of their intent to appear and protest, dutifully stepped into the cordoned-off area and got arrested. Although the Court was uncertain that mere entry onto an unrestricted public area would be enough to support a conviction, the addition of the cordon and the intentional act of the protestors in moving into what had become, at least for their benefit, a restricted area, was enough to support their conviction.

■ What general principles can be extracted from these decisions? First, reentering or being found within a military reservation is, for the most part, a strict liability element of the offense. The only recognized exception is being on property legally titled to the United States as a military authority, but which has been dedicated to a purely public purpose—for example, the end of the runway described in *Albertini*, or the public highway involved in *McCoy* or *LaValley*—and using the area only for that purpose. Second, proof of the government's legal title to an area is not essential. Of course, proof of title *can* satisfy the statute's requirement that the entry be onto a military reservation, but so can proof of a possessory interest which does not rise to the level of legal title. However, if the government chooses to rely not on legal title but on its exercise of a possessory interest, there must be some evidence that the defendant knew, or could have known, that such a possessory interest was being asserted. Usually, that will be through some type of marking or activity on the property itself. It can be a line, a rope, a sign, or some similar measure, but in the

case where only a possessory interest is alleged, some type of notice appears to be essential.

In this case, the United States offered proof of both types of interest in the DSCC driveway. Govt. Ex. 3, a certified copy of the Franklin County Auditor's map of this area, is the evidence of legal title. The testimony of several police officers that, as part of their job description, they had been told that they were "responsible" for the driveway area, is the evidence of a possessory interest and control of the area. The Court must examine this evidence closely and decide if there has been proof, beyond a reasonable doubt, of either legal title or a possessory interest in, and the exercise of control over, the place on the DSCC driveway where Zukowski was arrested. If not, he must be acquitted.

## III.   DISCUSSION

"The Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' "

*Francis v. Franklin,* 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985), *quoting In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). The standard of proof in a criminal case is intentionally set high, recognizing that the penalties available after conviction of a criminal offense are often harsh, and that a significant amount of proof should be insisted upon before a citizen is subjected to such penalties. The courts have often recognized that "it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship, supra* at 372, 90 S.Ct. at 1077 (Harlan, J., concurring).

If this were a jury case, and the Court used the pattern Sixth Circuit jury instructions, the jury would be told the following about reasonable doubt:

"A reasonable doubt is doubt based on reason and common sense. It may arise from the evidence, the lack of evidence, or the nature of the evidence. Proof beyond a reasonable doubt means proof which is

so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own lives."

That is the standard which the Court will apply to the government's proof.

On the "legal title" issue, the government's proof consists only of the auditor's map. (The government also suggested that the officers' testimony was "reputation evidence" as to the DSCC boundaries, but the Court rejects that notion). The map is not a model of clarity, nor is it clear for what purpose the map was prepared. A disclaimer at the bottom indicates that it was prepared in order to assist in the appraisal of real property, which is one of the functions of the auditor's office. It also indicates that the "cadastral data" was compiled from recorded deeds, subdivisions and survey plats, and other property record data, whereas other data came from aerial photographs. On the section describing map feature updates, the original cadastral compilation is said to have occurred from January, 1989 through December, 1993. Although no witness explained what "cadastral data" is, the Court concludes, from the definition of the noun "cadastre" found in *Black's Law Dictionary,* that it refers to a listing of property or property values for tax assessment purposes. None of the information on the legend which appears at the right-hand side of the map is specifically identified as cadastral information, although it might include the information under the "appraisal legend," which includes boundaries, parcels and subdivisions.

The appraisal legend indicates, under "parcels," that a particular maroon-colored line is a "parcel line." There are two such lines on either side of the driveway in question which run almost due north and south and which end at a black line running east and west. That line seems to mark either the northern boundary of Broad Street or the northern boundary of the sidewalk along Broad Street, and from the legend it appears to be a "right-of-way line." The maroon parcel lines go no further, but a green dashed line, which is identified as an "original subdivision lot line/original tract line" on the subdivision legend, runs along the same course out to the middle of Broad Street. The ends of the two

green dashed lines are connected by a red dashed line, which seems to be a "right-of-way center line." From this map, the United States argues that the Court can conclude beyond a reasonable doubt that the DSCC property lines extend on either side of the driveway to the middle of Broad Street and are connected at that point by a line which runs exactly along the right-of-way center line, notwithstanding the fact that the maroon "parcel lines" simply end at the edge of Broad Street and are not connected even by an "original" tract or subdivision line.

That may be a possible interpretation of the auditor's map. However, the Court does not believe that a possible interpretation of an otherwise unexplained auditor's map is the same thing as proof beyond a reasonable doubt. The map itself was presented without any explanation by a witness who was familiar with how the data on the map was prepared or what was meant to be conveyed by the various markings on the map. The disclaimer on the map clearly states that "[u]sers of this map are notified that the primary information sources should be consulted for verification of the information contained on this map." The explanation of the dashed green line as an "original" subdivision or tract line could well imply that some later conveyance of that portion of the original parcel took place. For example, the Court might conclude that Broad Street was built subject to an easement across the DSCC property, or it might conclude that it was built on property which was originally part of the DSCC (or some prior owner, since the word "original" is not date-specific), but later conveyed in fee simple to the city for purposes of building a road. If that is so, all that connects the "parcel lines" is a black "right-of-way" line—but that line is the same color as other lines on the map that do not seem to designate rights-of-way, like the cement island in the middle of the driveway. While it might not be sheer speculation to conclude that legal title to this driveway rests with the United States, this Court is not convinced beyond a reasonable doubt, based solely upon the unexplained, difficult-to-interpret, and secondary nature of the information contained on the auditor's map, that the United States holds such legal title.

Thus, the "legal title" branch of proof of this element is, in the Court's view, not enough to base a factual finding on beyond a reasonable doubt.

The other proof offered can be analyzed as proof that the DSCC exercises possessory control over the driveway. The Court believes that this proof, too, is not persuasive beyond a reasonable doubt. In other cases where possessory control has been found, some line, warning sign, physical barrier, or verbal direction had been given which put the defendant and other members of the public on notice that the government believed it had the right to control activities on that property. In this case, however, there is no evidence that the DSCC ever erected a gate, put up a fence, drew a line, or posted a sign at the entrance of the driveway advising members of the public that, once they turned northward from Broad Street and before they reached the barrier fence, gate, and gatehouse, they were entering onto property under the control of the United States. Similarly, there was no evidence that any kind of control device or warning sign existed between walkway from the federal credit union parking lot and edge of the driveway. The warning signs, gate and gatehouse are all back at the fence. The driveway was constructed in such a way that either a vehicle or a pedestrian who started up the driveway could, if he or she so desired, make a u-turn from the northbound lanes to the southbound lanes and go back to Broad Street without ever encountering an authority figure, or even being close enough to read a sign warning about the consequences of entering federal property without the appropriate permission or in possession of weapons or firearms.

Additionally, the testimony of the law enforcement officers that they had been told that they were "responsible" for this area is not enough to prove the exercise of control over the driveway beyond a reasonable doubt. There was no evidence that anyone had ever been arrested before on the driveway for being unlawfully on federal property. There was no evidence that anyone was ever arrested for having a weapon in the driveway. There was not even any evidence that DSCC officers had ever asked a lingering

motorist or pedestrian to move along. These indicia of control may exist, but they don't appear on this record.

Simply put, on the issue of legal title or possession and control, which has both factual and legal components, *see United States v. Parrilla Bonilla*, 648 F.2d 1373, 1386 n. 2 (1st Cir.1981), the Court is left with a residual and reasonable amount of doubt as to whether the driveway area where Zukowski was arrested constitutes part of the DSCC for purposes of 18 U.S.C. § 1382. It may be legally owned by the United States, and DSCC may exercise possessory control over it; but the question before the Court is not whether either of these propositions is true in the abstract. Rather, it is whether the amount of proof which the government presented at Zukowski's trial shows one of them to be true beyond a reasonable doubt. The Court does not believe that the record is so clear that reasonable doubt has been eliminated, and the defendant is therefore entitled to an acquittal.

## IV. CONCLUSION

This is a difficult case not only because of the uncertainty about whether the precise spot where Zukowski was arrested is part of the DSCC, but because of the role played by the strained relationship between Zukowski and his former employers, which may well have been aggravated by his own conduct. There is no doubt that the situation could have been handled better by both parties. Zukowski could have more clearly communicated his intent simply to deliver a letter for the base Commander; DSCC personnel could have more clearly determined whether Zukowski was there to attempt to enter into the base for some improper purpose, or simply there because he felt his letter was urgent enough that he wanted to hand deliver it rather than send it through the mail. It is regrettable, but perhaps understandable, that the confrontation which occurred on March 24, 1997 turned into a criminal prosecution. Since the United States invoked the criminal process, however, this Court believes it entirely appropriate to hold the government to a fairly exacting standard of proof before criminal penalties, even minor ones, are meted out to Mr. Zukowski for his conduct. The Court has struggled with this case, and eventually decided that the number of serious questions raised by the evidence of legal title to, or control over, the driveway were incompatible with what is meant by proof beyond a reasonable doubt. That being so, the law compels an acquittal. Consequently, the defendant is found not guilty of the charge contained in the information, and the information is hereby dismissed with prejudice.